THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEONARD HOLDMAN *et al.*, Defendants-Appellants.

First District (4th Division)   No. 61524

Opinion filed August 4, 1977.

Paul M. Brayman, of Criminal Defense Services, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

In a jury trial Willie Ross identified Leonard Holdman and DeWayne Williams (defendants) as the men who had robbed him at gunpoint in the early morning hours of February 4, 1973. Ross also testified that he had

identified the two defendants at a show-up a few hours after the robbery. On the basis of this testimony, defendants were convicted of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), and each was sentenced to a term of 4 to 6 years' imprisonment.[1] Both defendants have appealed.

Because we determine that the show-up identification and the subsequent in-court identification should have been suppressed as the direct products of improper arrests of the defendants, we reverse their convictions.

At the hearing on defendants' motion to suppress Ross' identification testimony, the following testimony was elicited:

At about 12:30 a.m. on February 4, 1973, Willie Ross had returned from a party and had just finished helping a friend get out of his car and into the friend's apartment at 521 West Englewood in Chicago. As Ross walked back to his car, a man grabbed his arm from behind and turned him around. The man had a gun in his hand and told Ross it was a "stick-up." A second man joined the first and they robbed Ross, taking his wallet. At the hearing Ross identified defendant Holdman as the gunman and defendant Williams as the man who took his wallet. After the robbery the two men fled in a car driven by a third person. Ross called the police, and at about 12:50 a.m. Officers Colton and Stien arrived and interviewed him in their squad car for 15 to 20 minutes. Officer Colton testified that the only description he received from Ross was that the men were two Negroes in their late teens, between 5'8" and 5'10" tall, wearing dark jackets. Ross described the escape vehicle as an older model Buick. Colton made notes of the interview but later that day he discarded them. After 15 to 20 minutes the interview was interrupted by a police radio message of a chase in progress. The officers drove to the scene of the chase, with Ross still in the back seat. When they arrived they observed a Buick which had crashed into a viaduct at 340 West 61st Place. Several squad cars were on the scene. The officers got out of their car, telling Ross to remain in it. But Ross, believing the Buick was the same car used by his robbers, walked over to the scene. In the back of one of the squad cars Ross saw the defendants seated with a third man. Ross identified the defendants as the men who had robbed him, specifying that Williams had held the gun and Holdman had taken his wallet. The interior light of the car was on and Ross could clearly see the defendants. Ross was then told to return to the squad car in which he had arrived.

The circumstances of the apprehension of defendants were related at the hearing by Officers Hamel and Hofer, and by Investigator Pienta. While on routine patrol in their marked squad car Officers Hamel and Hofer saw a Buick Skylark in front of them. They decided to investigate further because they believed the vehicle to be one used on prior

[1] A third defendant, Robert Toney, was acquitted.

occasions by one Orlando Page, for whom they had a warrant. The basis of this belief was their observation of a similar vehicle on numerous occasions in the vicinity of Page's home. They had never seen Page in the vehicle, nor did they know whether he owned it. The officers pulled along side the Buick and shined their spotlight on the driver, whom they clearly saw and later determined to be Robert Toney. They saw a second person on the passenger side whom they could not identify. Toney looked over at the officers and then accelerated ahead of the squad car. The officers chased the car with their emergency equipment on, including the siren. At one point the Buick stopped, and when the spotlight was shined on it the officers saw the person in the passenger seat whom they later identified as defendant Williams. The car then accelerated in reverse and a short chase ensued, ending when the Buick crashed into a viaduct. The officers saw one man run from the driver's side into a field. They chased him and then observed a total of three men running through the field. The three ran around a corner and were temporarily out of the officers' sight. When the officers rounded the corner they saw Investigators Pienta and Gaffney talking to three men. The investigators had responded to a call for assistance communicated by Officers Colton and Stien, had seen the three men running through the field, and had stopped them for questioning moments before the officers arrived. The officers informed the investigators that these were the men they had been chasing. According to Investigator Pienta, the men were then placed under arrest. They were searched and placed in the investigators' car, driven back to the crash scene, then placed in the officers' marked squad car. A radio message was received requesting them to wait for beat car 720 to arrive. This was the car in which Ross was being interviewed. About five minutes later the car arrived and the identification already described was made.

At trial essentially the same facts were adduced along with the following additional relevant testimony:

Ross identified defendant Williams as the man who held the gun on him, and described him as having worn gray pants, a black and rust-colored jacket, and a black hat covering most of his face, and having no facial hair. Ross identified defendant Holdman as the second robber and described him as having worn a blue windbreaker jacket, a t-shirt, and white or beige slacks. He stated that Holdman took his wallet; he stood directly in front of Ross when he took it, close enough so Ross could "kiss him." Ross asked Holdman if he would return his charge plates and important papers. Holdman said he would mail them to him.

Officer Hofer testified that his attention was drawn to the Buick because there were three young men in it. When Hofer saw Investigators Pienta and Gaffney talking to three men, he recognized defendant Williams and Robert Toney. The third man he identified at trial to be Holdman. Hofer

described Williams as having worn a black leather coat with brown rust-colored inlay and gray pants. Holdman was wearing a blue windbreaker jacket with dark pants. At trial Pienta did not state that defendants were arrested when Officers Hofer and Hamel arrived, but he did testify that they were placed in a car and driven back to the crash scene. No one described Williams as wearing a hat at the crash scene, but Officer Hamel noticed a black felt hat on the rear seat of the Buick.

Defendants did not testify. They did present alibi testimony which, in view of our disposition, we need not consider.

On appeal defendants make the following contentions: (1) Ross' identification testimony should have been suppressed as the product of the illegal arrests of the defendants; (2) Ross' identification testimony should have been suppressed as the product of an unnecessarily suggestive show-up; (3) defendants were denied due process of law by the destruction of Officer Colton's notes; (4) defendants' guilt was not established beyond a reasonable doubt.

We first consider defendants' contention that the trial court erred in denying their motion to suppress the identification testimony of Willie Ross because it was the product of illegal arrests.

■■ The State does not contest that there was an arrest of the defendants before Ross' crash-scene identification. At the hearing on the motion to suppress Investigator Pienta stated that defendants were arrested when Officers Hamel and Hofer informed him that they were the men they had been pursuing. Defendants were searched and then placed in one police car, driven back to the crash scene, and placed in another police car where they were held until the identification took place. The police had the general authority to make an arrest; there was testimony that they asserted that authority with intent to make an arrest, and defendants were restrained and taken into custody pursuant to that assertion of authority. Clearly they had been placed under arrest. Ill. Rev. Stat. 1975, ch. 38, par. 107—5(a); *People v. Grant* (1976), 38 Ill. App. 3d 62, 347 N.E.2d 244; *People v. Howlett* (1971), 1 Ill. App. 3d 906, 274 N.E.2d 885.

The crucial question is whether the police had probable cause to make the arrests. A warrantless arrest is proper if the officer has reasonable grounds for believing that the person to be arrested has committed a criminal offense. (Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c); *People v. Wilson* (1970), 45 Ill. 2d 581, 262 N.E.2d 441.) A mere suspicion cannot validate an arrest. *Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168; *People v. Bambulas* (1969), 42 Ill.2d 419, 247 N.E.2d 873, *cert. denied* (1969), 396 U.S. 986, 24 L. Ed. 2d 450, 90 S. Ct. 480.

■■ The State contends that the arrests were justified because the defendants, by fleeing from the officers, committed the crime of resisting

or obstructing a police officer in the performance of his duties. (Ill. Rev. Stat. 1975, ch. 38, par. 31—1.) But the cases cited in support of this proposition are distinguishable on their facts. In *People v. Staples* (1971), 1 Ill. App. 3d 922, 275 N.E.2d 259, the police officers saw a man fitting the general description of a suspect in several burglaries which had recently occurred in the area. They stopped him for investigative questioning, then began to search him for weapons at which point he fled. This court held that these facts gave the officers probable cause to then arrest the defendant, apparently for the original crime for which they had stopped him for questioning. No mention in the opinion was made of section 31—1 of the Criminal Code. In *People v. Carroll* (1971), 133 Ill. App. 2d 78, 272 N.E.2d 822, the defendant was charged and convicted for violation of section 31—1. The court found that he was placed under arrest and then fled from the arresting officer. Even though they found the initial arrest invalid for lack of probable cause, defendant's flight from that arrest was held to be an act of resistance to what at the time was presumptively a legal arrest, and therefore defendant was found to have violated the statute. In the case at bar defendants did not flee *after* being stopped or arrested. They were merely the passengers of a car being chased by the police. As soon as the officers caught them they were arrested and searched even though the officers were aware that defendants had not been driving the fleeing vehicle. This was not a case like *Staples* where a suspect matched a fugitive's description, was stopped, and then fled, thus supplying probable cause as to the initial crime being investigated. The officers testified that they suspected the car in which defendants were riding might be involved with a man for whom they had a warrant. Once they apprehended the occupants of the car it was clear that their suspect was not among them, hence probable cause was not created. Defendants' flight on foot from the officers may have provided the articulable facts necessary to justify an investigatory stop, for which proper procedures are established by statute and case law. (Ill. Rev. Stat. 1973, ch. 38, pars. 107-14, 108-1.01; *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Lee* (1971), 48 Ill. 2d 272, 269 N.E.2d 488; *People v. Basiak* (1977), 50 Ill. App. 3d 155, 365 N.E.2d 570.) But the officers did not utilize those procedures. Defendants were immediately arrested, searched, and taken into custody without any preliminary questioning by the officers who had been pursuing them. Nor was this a situation analogous to *Carroll* where the defendants fled after being subjected to a presumptively valid arrest, or even after a presumptively valid stop. The officers, therefore, had no probable cause on which to base their arrests.

■■ Indeed, there is nothing in the record to indicate that the officers ever considered that defendants had violated section 31—1. They were never charged with such a violation, nor was there testimony by any

officer that they were arrested for that violation. It is well established that information discovered as a result of an invalid arrest cannot validate tht arrest. (*People v. Johnson* (1973), 14 Ill. App. 3d 254, 302 N.E.2d 430; *People v. Macias* (1968), 39 Ill. 2d 208, 234 N.E.2d 783, *cert. denied* (1969), 393 U.S. 1066, 21 L. Ed. 2d 709, 89 S. Ct. 721; *People v. Macklin* (1933), 353 Ill. 64, 186 N.E. 531.) By analogy, the State cannot use an after-the-fact construction of probable cause to justify an arrest when the record is devoid of any indication that such cause was the actual basis for the arrest. The initial arrests of the defendants were unlawful for lack of probable cause.

■■ When evidence is discovered as a direct result of an illegal police search or seizure that evidence must be suppressed. (*Weeks v. United States* (1914), 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341; *Elkins v. United States* (1960), 364 U.S. 206, 4 L. Ed. 2d 1669, 80 S. Ct. 1437; *Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684.) As an extension of that exclusionary rule, evidence indirectly discovered as a result of information gained from an unlawful search or seizure also must be suppressed. (*Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182; *Nardone v. United States* (1920), 251 U.S. 338, 84 L. Ed. 307, 60 S. Ct. 266; *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) The exceptions also developed in those cases were succinctly summarized in *United States ex rel. Owens v. Twomey* (7th Cir. 1974), 508 F.2d 858, 865:

> "* * * there have evolved three tests from *Wong Sun*, any one of which, when applicable, establishes that the controverted evidence is not the fruit of the poisonous tree when: (1) the evidence was discovered by an independent source; (2) the evidence is sufficiently distant in causal connection from the illegal search and seizure so that the connection has become so attenuated as to dissipate the taint; or (3) the evidence inevitably would have been gained even without the unlawful search."

Illinois courts have applied these principles to suppress the testimony of witnesses discovered as a result of illegal searches and seizures. (*People v. Martin* (1942), 382 Ill. 192, 46 N.E.2d 997; *People v. Albea* (1954), 2 Ill. 2d 317, 118 N.E.2d 277.) More recently they have suppressed testimony concerning identifications which resulted from the illegal arrest of defendants. *People v. Bean* (1970), 121 Ill. App. 2d 332, 257 N.E.2d 562; *In re Woods* (1974), 20 Ill. App. 3d 641, 314 N.E.2d 606.

Applying these principles to the facts before us, it is clear that any testimony concerning the crash-scene identification by Ross of defendants should have been suppressed. The identification was the direct, immediate result of the illegal arrests of the defendants. Had it not been for the arrest of defendants, they would not have been in custody in the

squad car where Ross could view them. The trial court erred in denying the motion to suppress testimony as to this identification.

■■ ■ The in-court identification by Ross must be examined separately. The applicable test is whether there was an independent basis for the identification. (*People v. Hornal* (1975), 29 Ill. App. 3d 308, 330 N.E.2d 225; *People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448.) Specifically, was the in-court identification based on Ross' opportunity to observe his assailants at the time of the robbery, or was it influenced by the crash-scene identification? Shortly after the robbery occurred, during an interview lasting 15 to 20 minutes, Ross could only give a general description of his robbers as two male Negroes in their late teens, between 5'8" and 5'10" tall, wearing dark jackets. It is true that the interview was interrupted by the radio report of a chase in progress, but only after 15 to 20 minutes in which Ross had not only described his robbers but also had given a description of the car they used. There was no evidence to show that he was prevented by time constraints from giving a more detailed description. Yet at trial Ross gave a much fuller description: Williams had on gray pants, a black and rust-colored jacket, and a black hat. Holdman wore a blue windbreaker jacket, a t-shirt, and white or beige slacks. These descriptions are very similar to those recalled by Officer Hofer who observed the defendants at about the same time at the crash scene. After a careful review of the testimony we conclude that Ross' in-court identification was directly affected by his viewing of the defendants just after their illegal arrest. The State failed to establish by clear and convincing evidence that the in-court identification had an independent origin arising from Ross' uninfluenced observation of the crime. (*People v. Hahn* (1976), 39 Ill. App. 3d 969, 350 N.E.2d 839; *United States ex rel. Harris v. State of Illinois* (7th Cir. 1972), 457 F.2d 191, *cert. denied* (1972), 409 U.S. 860, 34 L. Ed. 2d 106, 93 S. Ct. 147.) Nor could any such showing be made on retrial. Since Ross' in-court identification was directly traceable to the illegal arrests of the defendants, it, too, was erroneously admitted at trial. Ross' identifications of the defendants were the sole basis for their convictions. Because of our determination of this issue we need not consider defendants' other contentions.

The judgment of the trial court is reversed.

DIERINGER, P. J., and JOHNSON, J., concur.