THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LEONARD HOLDMAN *et al.*, Defendants-Appellants.

First District (4th Division)   No. 61524

Opinion filed September 6, 1979.

Paul M. Brayman, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendants, Leonard Holdman and DeWayne Williams, were convicted of armed robbery in a jury trial and were each sentenced to 4 to 6 years' imprisonment.[1] On appeal we reversed their convictions, finding that they had been arrested without probable cause, so that resulting identifications upon which their convictions were based should have been suppressed as the fruit of the illegality. (*People v. Holdman* (1977), 51 Ill. App. 3d 484, 366 N.E.2d 993.) Our supreme court, having allowed the State's petition for leave to appeal, found the arrests proper and reversed our judgment, remanding to us for consideration of the defendants' other contentions not originally considered by us because of our disposition of the cause. *People v. Holdman* (1978), 73 Ill. 2d 213, 383 N.E.2d 155, *cert. denied* (1979), 440 U.S. 938, 59 L. Ed. 2d 496, 99 S. Ct. 1285.

The remaining contentions of the defendants are: (1) they were denied due process of law when a police officer destroyed the notes he took of a conversation with the complaining witness; (2) the in-court identification of the defendants should have been suppressed as the product of an unnecessarily suggestive show-up; (3) guilt was not established beyond a reasonable doubt. We affirm the judgment of the trial court.

The pertinent facts of the case follow. Prior to trial the defendants moved to suppress the identification testimony of the complaining witness, Willie Ross. That motion was based in part on the contention that a confrontation between Ross and the defendants was unduly suggestive. At the hearing on that motion the following testimony was elicited. On February 4, 1973, at about 12:30 a.m. Willie Ross was in the vicinity of 521 West Englewood in Chicago. He had just driven from a party where he consumed about four alcoholic drinks. Ross had offered a ride home to a man he met at the party. He had just helped the man to his door and was walking back to his car. when someone came up from behind and grabbed him, turned him around, and announced a stickup. There were street lights nearby and Ross could see that the man had a gun. A second man joined the first and they robbed Ross, taking his wallet.

At the hearing Ross identified defendant Holdman as the gunman and defendant Williams as the man who took his wallet. After the robbery the two men fled in a car driven by a third person. Ross called the police and at about 12:50 a.m. Officers Colton and Stein arrived and interviewed Ross in their squad car for 15 to 20 minutes. Officer Colton testified that Ross described the men as two Negroes in their late teens, between 5'8"

---

[1] A third individual, Robert Toney, was acquitted in the same trial.

and 5'10" tall, wearing dark jackets. Ross described the escape vehicle as an older model Buick. Colton made notes of the interview but later threw them away. After 15 to 20 minutes the interview was interrupted by a police radio message concerning a chase in progress. Ross recalled that the officers told him they were going to assist the police involved in the chase. Officer Colton testified that they also told Ross the car sounded like the one he had described. They did not tell Ross they wanted him to identify anyone, or that anyone was in custody. The officers drove to the scene of the chase, with Ross still in the back seat. When they arrived they observed a Buick which had crashed into a viaduct at 340 West 61st Place. Ross told them the car looked like the one used by the men who had robbed him. Colton instructed Ross to remain in the car and the officers left the car to talk to other officers at the scene. But Ross then left the car and walked over to a nearby squad car. A dome light was on inside the car and he could clearly see the faces of three men sitting inside. Ross identified two of the men, defendants Holdman and Williams, as the men who had robbed him. After he told the police this he was told to return to the car in which he had been sitting. Ross testified that the three men were in the car the entire time he was there. He denied having told a defense investigator that the three were up against the car with their hands spread out on the hood when he saw them. He also denied telling the investigator that on the way to the scene the police suggested to him that the men who robbed him were the ones being chased.

The circumstances of the arrests of the defendants were also related at the hearing. Those facts were summarized in our earlier opinion and are for the most part not relevant to the issues before us.

After the defendants were arrested and placed in the squad car a radio message was received requesting the police to wait for beat car 720 to arrive. This was the car in which Ross was riding. About five minutes later the car arrived and the identification already described was made. The four police officers testifying at the hearing all recalled that defendants were sitting in the back seat of the squad car when Ross identified them. One officer recalled that defendants were handcuffed at the time; the three others said they were not yet handcuffed. Ross testified that he did not know whether defendants were handcuffed when he identified them; he did not pay any attention to that. Following the hearing defendants' motion was denied.

Substantially the same testimony was elicited at trial with the following additions and changes. Willie Ross recalled that he had five drinks at the party instead of four. He could not remember the name of the man to whom he gave a ride; he first met him at the party. Ross said that Englewood, lighted with street lights, was "bright" so that "[y]ou could see good." He identified defendant Williams as the man who held

the gun on him, describing him as having worn gray pants, a black and rust colored jacket, a black hat covering most of his face, and having no facial hair. He identified defendant Holdman as the second robber and described him as having worn a blue windbreaker jacket, a t-shirt, and white or beige slacks. Holdman took the wallet, standing directly in front of Ross as he did so. He was close enough so that Ross could "kiss him." Williams was about three feet away. Ross asked Holdman if he would return his charge plates and important papers; Holdman said he would mail them. The defendants then walked to a car which Ross described as a 10-year-old green Buick or Chevrolet. Ross indicated at trial that police were called at his request by a woman at a nearby hotel. He recalled the address of the hotel as 521 West Englewood, but it was stipulated that the correct address was 515 West Englewood.

Also at trial Mark Hofer, one of the officers involved in the arrest of the defendants, described the clothing defendants were wearing at the time of the arrest. Williams had on a black leather coat with rust-colored inlays and gray pants. Holdman wore a blue windbreaker and dark pants.

The defendants presented an alibi defense. Willie Wright, a friend of the defendants, testified that at about 6:30 p.m. on the night of the robbery he and the defendants, along with Robert Toney and Robert Mosely, went to the second-floor apartment of Mrs. Fannie Coleman at 316 West 61st Street. Wright lived at the same address on the third floor. Mrs. Coleman asked them to go to church with her and later that night, at about 7 or 8 p.m., they did so, remaining there with her for three or four hours. Wright then returned to his apartment where he was joined by the other men at about 12:30 a.m., five minutes after he had arrived. They all went to Mrs. Coleman's apartment, although Williams and Toney stayed on the front porch to smoke a cigarette. Wright could not remember if Holdman also stayed on the porch with them. They stayed out there for about three minutes, although Wright indicated that because he did not have a watch it could have been longer. He was inside for this period, but could hear them talking on the porch. They then joined the others inside. All of them stayed for about two hours and then left to get some cigarettes and soft drinks. On the way Wright and Toney were picked up by the police for an undisclosed reason and then were released. Everyone then returned to Mrs. Coleman's home for about half an hour and then again left for cigarettes and soft drinks. This time the police seized the defendants, transporting them to the accident scene at 61st Place. Wright testified he had never seen the defendants in a 1964 green Buick.

Mrs. Coleman in her testimony confirmed that defendants and the three others went to church with her that evening from about 8 p.m. to 12 or 12:30 a.m. When they all returned to her apartment the defendants stayed out on the porch. About 15 minutes later they all knocked on her

door and asked to come in to discuss the Bible. This was about 1 a.m. and they stayed until 2 a.m. Mosely and Wright returned about 20 minutes after they all left, telling her there had been an encounter with the police. Mrs. Coleman also testified that the first time she met the defendants was that night when she invited them to come to church with her. They had not accompanied her to church after that date.

## I.

Defendants contend that their convictions should be reversed because they were denied due process of law when Officer Colton threw away the notes he took during his interview of the complainant immediately following the robbery. Defendants do not assert that this was an intentional effort to suppress evidence, conceding that the record does not support such a finding. Rather, they contend that even the negligent or inadvertent destruction of this material prejudiced them and requires a new trial, citing *City of Seattle v. Fettig* (1974), 10 Wash. App. 773, 519 P.2d 1002; *Trimble v. State* (1965), 75 N.M. 183, 402 P.2d 162, and *United States v. Heath* (D. Haw. 1957), 147 F. Supp. 877, *appeal dismissed* (9th Cir. 1958), 260 F.2d 623.

In *Fettig* the defendant was arrested for driving while intoxicated and was immediately required to perform certain physical sobriety tests which were recorded on video tape. Those tapes were used as evidence at his initial municipal court trial. He was convicted at that level but as permitted under Washington law he appealed the conviction to the Superior Court where he was given a *de novo* trial. However, prior to this trial the police negligently destroyed the video tapes. Defendant's motion to dismiss on this ground was denied and he was convicted.

On review, the Washington court of appeals noted that part of defendant's offer of proof at the second trial was the testimony of the judge who presided in his municipal trial, stating that the tapes indicated defendant was not intoxicated. The court then found a reasonable possibility that the tapes tended to rebut the police testimony while corroborating that of the defendant. Since the defendant's due process rights were thus violated, the case was reversed.

In *Trimble* the defendant, charged with murder, claimed to have acted in self-defense when the victim attacked him after defendant accused him of having made improper advances to the defendant's wife. Defendant also claimed to have previously written a letter detailing this behavior by the victim and additionally said that he had tape-recorded one such conversation between the victim and the defendant's wife. After the killing the police confiscated a copy of the letter and a number of tapes. The letter was lost and the tapes were returned with some material omitted according to the defendant. The court found that the evidence

clearly would have supported defendant's claim of self-defense. Although the evidence was lost through negligence, it held that the conviction must be reversed.

In *Heath* the defendant was indicted for wilfully attempting to evade payment of income taxes. To aid in his defense he sought certain books and records he had turned over to the Internal Revenue Service, but the records had been lost. The trial court dismissed the indictment, holding that the fact the records were lost rather than wilfully withheld did not lessen the prejudice to the defendant.

■■ Although this court has on at least one occasion indicated that in the proper case the negligent loss or destruction of evidence by the State might require a new trial (*People v. Steptoe* (1976), 35 Ill. App. 3d 1075, 343 N.E.2d 1), we do not find this to be such a case. In the three cases cited by defendant it was clear that the lost evidence was crucial to the defendants' defenses; furthermore, the prosecution in those cases apparently denied that the evidence would establish that claimed by the defendants. Here there was no such denial; indeed, it was the testimony of Officer Colton concerning what the complainant told him that provided the framework for defendants' claim of a subsequent suggestive and improper show-up. Nothing in the record suggests that the notes taken by Colton would have supplied any different or additional information. Defendants concede in their brief that they "cannot state for certain" that the material in these notes would have impeached the testimony of Colton or Ross. In fact at trial they failed to question Ross as to any inaccuracies in Colton's recollection of their conversation. Under these circumstances we do not find the inadvertent destruction of this evidence by the State to have prejudiced the defendants.

## II.

Defendants next contend that Mr. Ross' in-court identification of them should have been suppressed as the product of an unnecessarily suggestive show-up.

It cannot be disputed that the crash-scene confrontation between Ross and the defendants included suggestive elements. On the way to the scene Ross was alerted that the get-away car might be involved in the chase. At the scene the defendants were seated in a police car along with Robert Toney. The getaway car was nearby. But suggestive aspects to an identification do not automatically require its exclusion along with subsequent identifications made in its wake. The identification is to be judged from the totality of the circumstances. (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.) Factors to be considered are: the opportunity of the witness to view the criminals at the

time of the crime; his degree of attention at that time; the accuracy of his prior description of the criminals; the degree of certainty of the identification; and the elapsed time between the crime and the confrontation. (*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375; *Manson v. Brathwaite; People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) If upon consideration of these factors the identification is deemed to have been reliable it is admissible despite the existence of some suggestive features.

■■ Willie Ross viewed the two men who robbed him at close range under street lighting conditions that he said permitted him to see well. He had a short conversation with one of the men. Thus he had a good opportunity to view them and his attention was clearly drawn to them. Immediately after the occurrence he was able to describe their approximate heights and ages as well as their race. He also noted they were wearing dark jackets. This was a limited description, but there is no indication that it was inaccurate. Without prompting, and indeed in disobedience of police orders to remain in the car, he viewed the three men at close range and promptly and unequivocally identified the defendants as the men who had robbed him, specifying their individual roles in the robbery. This took place within an hour of the robbery. Under these conditions we find the identification to have been reliable despite its suggestive features.

In addition to the reasons already cited for the propriety of this identification, there were exigent circumstances which rendered the police behavior in this case proper. The victim had been robbed at gunpoint about an hour before the confrontation. It was unclear whether these armed men were still at large. Under such circumstances the courts have recognized the necessity of immediate identification confrontations to enable the police to determine whether a continued search is necessary. *People v. Manion; People v. Elam* (1972), 50 Ill. 2d 214, 278 N.E.2d 76.

In *Elam* the identification took place 10 minutes after the robbery and 1½ blocks away. In *Manion* it was 10 to 15 minutes later in a "nearby" parking lot. Here the time factor was longer, about one hour, and the distance greater, but the important point of similarity is that the immediate post-crime investigation was continuing in the area. There was a need to determine whether a search of the area should be launched, just as in *Elam* and *Manion* there was a need to know whether to continue searching. To the extent, if any, that it may have been deliberate, and there were a number of accidental aspects to this identification, the behavior of the police was proper.

Although defendants also raise the question of the independent nature of the subsequent in-court identification made by the victim, that

argument is premised on a finding that the out-of-court identification was improper. We need not reach the issue because our finding that the earlier identification was reliable also is determinative of the admissibility of the in-court identification made in its wake. *Manson v. Braithwaite*; *Manion.*

## III.

■■ Finally, we find no basis for overturning the jury's determination of defendants' guilt. Defendants point to a number of inconsistencies in the complainant's testimony, such as his incorrect citation of the address of the hotel from which the police were summoned and his varying testimony as to who actually called the police. But these discrepancies only presented a question of credibility for the jury; they were not of such a magnitude as to provide a basis for reversal of the jury's verdict. (*People v. Gray* (1969), 106 Ill. App. 2d 110, 245 N.E.2d 626.) Nor do we find any doubt arising from the fact that the conviction rests upon the testimony of a single identifying witness, for we have already determined that this identification was grounded in circumstances providing an ample opportunity for a reliable observation of the accused by the witness. (*People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.) And although the alibi testimony presented by two defense witnesses was uncontradicted by the State, there was no obligation on the jury to believe such testimony. (*People v. Jackson* (1973), 54 Ill. 2d 143, 295 N.E.2d 462.) Even if believed, the testimony of Mrs. Coleman, the one defense witness with no apparent ties to the defendants, indicated that at some point between 12:30 a.m. and 1 a.m. there was a 15-minute period when she did not see the defendants. As the prosecutor argued to the jury at trial, this provided a sufficient opportunity for the defendants to commit the robbery and return to their alibi source. Under these circumstances we find the jury's verdict to have been amply supported by the evidence.

For the foregoing reasons defendants' convictions are affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.**

** *Justice Henry Dieringer who participated in the original opinion has since retired. Justice David Linn was designated the third member of the panel. He has reviewed the prior opinions, has listened to the tape of the oral argument and has read the briefs and record.*