THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE SAMPSON, JR., Defendant-Appellant.

First District (3rd Division)   No. 79-813

Opinion filed June 11, 1980.—Modified on denial of rehearing July 30, 1980.

William J. Harte and John G. Jacobs, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SIMON delivered the opinion of the court:

The defendant, charged with rape, deviate sexual assault and aggravated kidnapping, was denied hearings on his motion to suppress a

lineup identification as the fruit of both an illegal arrest and suggestive identification procedures and on his motion to suppress photographs as the fruit of a statement he made while unaware of his constitutional right to remain silent. While the jury deliberated, the trial court resolved for it a question of fact which bore on the credibility of the complaining witness. These rulings denied the defendant a fair trial. His convictions are reversed and the case is remanded for hearings on his motions and for a new trial.

## THE FACTS

On the evening of October 9, 1974, the complaining witness was abducted, assaulted and raped as she returned home from a meeting at the local high school. A car followed her into the parking lot of her apartment complex, and the driver approached her when she reached her building's front door. He asked for directions to a nearby address, but when the victim turned to indicate the proper way to go, he hit her on the side of the face and dragged her to his car. The man said he had a knife and threatened to kill her. The victim was placed in the front seat of the car with her head pushed down so that she could see only the dashboard. After a 90-second drive, the driver stopped in an unlighted area. There the victim was forced to commit two deviate sexual acts and was raped. After the rape, the man, who was black, stated that he was looking for a white person to kill, that he was from Missouri and that his mother had been raped by a white man there and died. He then asked aloud why he was doing this and what he was trying to prove. The attacker told his victim that he would not kill her, and she got out of the car and walked back to her apartment.

The victim told her husband she had been raped and called the police. She gave them a description of the attacker and of the man's car. The officers took her to the hospital where she was examined and released. The victim looked at several hundred photographs at the police station, but was unable to pick out her assailant. She told officers she thought the man might have been a member of the Chicago Fire, a professional football team. Several members of that team lived in her complex, but no pictures of team members were shown to her.

Five months later, Investigator John Smith of the Cook County sheriff's police learned of another rape. The victim of that attack prepared a composite drawing of her attacker. The next day, March 13, 1975, Smith showed 10 photographs to the victim in this case. She said one of the photographs (not the defendant in this case) resembled the man who attacked her, but, because the photographs were old, she would have to see the man in person to be sure. Police obtained an arrest warrant but did not seek a search warrant. Instead, they waited until 4:30 the next morning

to break into the man's house and arrest him. He was placed in a lineup but released when the victim in this case did not identify him as her assailant.

After the lineup, the victim supplemented her description by telling Smith that while being raped she had felt an abnormal growth on the man's scrotum. Her testimony at trial was that she told the police about this additional feature on the day of the March 14 lineup. She explained the delay in adding this detail by stating that she had been embarrassed to tell police about it.

On March 29, 1975, Smith noticed the defendant walk into the Niles police station to inquire about a Cook County wheel tax sticker. Sampson appeared to fit the description given by the rape victim, including her observation that the man was articulate. Smith heard the defendant speak "devoid of a Southern accent," and so followed him home. Smith continued his investigation in the case for 6 weeks. On May 13, 1975, he told Officer Wojtas, a patrolman, to bring the defendant to the station. Wojtas obliged by waiting in his squad car for Sampson outside the defendant's home and stopping him when he arrived home from work. Wojtas told the defendant he was receiving a ticket for having no wheel tax sticker on his car and demanded that Sampson accompany him to the police station. In fact, the sticker violation was a ruse and the arrest was actually being made for rape.

Neither Wojtas nor Smith had sought a warrant for the defendant's arrest. After the arrest, Sampson was never informed of the true offense for which he had been taken into custody. At the station Sampson was not advised of his *Miranda* rights. In response to interrogation he told police that he had a "hair bump" (caused by an ingrown hair and common to black persons) on his scrotum. The hair bump was then examined and photographed. Following the photographing, defendant was for the first time given his *Miranda* rights and later placed in a lineup. The victim in this case observed the lineup and said that the defendant was similar to her assailant though he appeared to have gained weight. She did not make a positive identification of Sampson that day. At trial, referring to her failure to make a positive identification at the lineup, the victim explained that she knew the defendant was her assailant, but did not want to go through with signing a complaint. She went home and talked to her husband and to friends who advised her that if she knew who had attacked her she had to get involved and identify him. The victim said she was "pressured" by these friends, and following her talks with them she called police by telephone the next day and made a positive identification of the defendant. On May 16, 1975, the victim was taken to the Niles courthouse to observe the defendant's bond hearing.

The defendant was first tried for the later rape that Smith had been

investigating at the time of Sampson's arrest. The victim in this case as well as the victim in that case testified and each identified the defendant as her attacker. Nevertheless, the jury acquitted Sampson. Because of the acquittal, the denial in that case of the defendant's pretrial motion to suppress the identification as the fruit of an illegal arrest was never appealed.

The State then proceeded to trial on the instant charges. Defendant moved before trial to suppress the lineup identification, his statement to police and the photographs of his scrotum. He argued that the lineup was the fruit of a ruse arrest made without probable cause to arrest for rape. The trial judge ruled that the issue of the validity of the arrest had already been litigated in the State's favor in the prior case, and denied defendant's motion without a hearing. The State proposed that it would not use Sampson's statement to police at trial, and so the motion to suppress the statement was also denied without a hearing. The trial judge finally ruled that ·Miranda did not apply to photographs and so denied the motion to suppress the photographs, rejecting without a hearing· the defendant's argument that the photographs were the fruit of the illegally obtained statement.

After the jury was selected and sworn, the defendant moved to suppress the lineup identification on the ground that it was the result of suggestive identification procedures. Counsel explained the delay in filing the motion by referring to two documents tendered to the defense in discovery. The first, an "Additional Supplemental Report" of the lineup in narrative form, had been given to the defense many months before trial. Counsel argued that this report suggested that the victim made a positive identification of the defendant immediately after viewing the lineup. The second, the actual lineup report, was not produced by the prosecutor until the eve of trial. It explicitly stated that no positive identification was made at the lineup. After examining the documents, the trial court held that the defense should have understood the supplemental report as stating that no positive identification had been made, and without a hearing denied the motion to suppress as untimely.

Trial then commenced. After hearing all the testimony the jury retired to deliberate. The main issue in the case was credibility. The victim identified the defendant as her assailant, while he presented an alibi defense, claiming that he was in a restaurant 10 miles away at the time of the attack. Two of Sampson's business associates agreed that he was in the restaurant that evening, but depending on what time the·three left the restaurant he might have reached the victim's apartment complex in time to commit the offense. The defense also argued that the identification was not credible. The victim's description of the attacker's

car conflicted with photographs of Sampson's car. She failed to notice Sampson's solid gold front tooth, though she said she would have remembered it if she noticed it. She failed to either describe the growth she felt on the attacker or identify the photographs taken of the defendant's growth. Sampson claimed that the hair bump he had when arrested had gone away, as they are wont to do. He testified that he did not have such a growth either at the time of trial or at the time of the offense.

The jury sent three requests to the trial court while deliberating. The first asked for a map of the area, marked with the locations of the attack and the restaurant, which had been received in evidence. This was refused. The second made a general request for unnamed transcripts of testimony. This was also refused. The third note read:

"Witness: Detective Smith

Question is on order of events.

   When defense lawyer * * * questioned Detective Smith, did he (Smith) pick up defendant (Willie Samson) before he (Smith) heard the additional testimony from [victim] (about the growth on defendant). Were the pictures * taken before [victim] told Smith about bump on Willie Samson.

   *Pictures of Willie Samson's scrotum."

The trial court felt that it would be proper to answer the questions, since they concerned testimony that was uncontroverted and undisputed. The defense objected, stating that although the victim's testimony was uncontroverted it was not undisputed. It pointed to its cross-examination of the victim where it unsuccessfully tried to get her to admit that the idea of the growth was planted in her mind only after the defendant's arrest. The trial judge answered the questions by writing "No" on the note after each one. He then sent the note back to the jury. The jury reached a verdict of guilty on all counts.

Sampson was sentenced to a term of 15 to 25 years' imprisonment. He now appeals and alleges that he should have been given hearings on his pretrial motions to suppress, that he was not proven guilty beyond a reasonable doubt, that the jury's verdict was tainted by the answers sent to it by the trial judge and that the sentence was excessive.

### THE COURT'S COMMUNICATION TO THE JURY

■■ The trial judge erred in answering the questions asked by the jury on the order of evidence, for in doing so he resolved issues of fact for the jury, usurping its function and depriving the defendant of his right to have the jury determine those facts. The note sent by the jury was not a request to review the testimony at trial. Questions from the jury "should be

literally construed to mean just what they say \* \* \*." (*People v. Williams* (1975), 60 Ill. 2d 1, 13, 322 N.E.2d 819, 826.) The note here did not ask what the testimony of witnesses had been, but rather, simply put, "what happened." The court's answers to the questions prejudiced the defendant, for the answers reflected the version of events offered by the prosecuting witness. The trial judge stamped the State's position with his approval, thus adding his stature to the truth and veracity of the victim in a case in which her credibility was extremely important. The victim's testimony about feeling a growth on her attacker's scrotum was a vital element of her identification. The answers to the questions may have contributed to the jury's acceptance of the victim's identification of the defendant as her assailant.

The State argues that the court's answers were proper because the evidence as to when the victim told the police about the defendant's growth was uncontroverted. Though uncontroverted, it was disputed. The defense put the matter into issue in the most pointed way possible: intensive and exacting cross-examination intended to leave the impression that the police suggested the testimony of the growth to the witness. The credibility of witnesses, especially complaining witnesses, is crucial (*People v. Queen* (1974), 56 Ill. 2d 560, 566, 310 N.E.2d 166, 169), and the impact of the answers on the jury's assessment of the victim's credibility and reliability might have been so great here as to assure conviction. The verdict of guilty is tainted by the trial judge's improper communication to the jury, and the case must be returned for a new trial.

In remanding the case, we make no comment on the weight of the State's case other than to state that there was sufficient evidence presented on which to reach a verdict of guilt. The defendant contends that the victim's identification was weak and that his alibi was strong, but these are arguments best directed to the finder of fact. (*People v. Hamilton* (1980), 81 Ill. App. 3d 297, 300, 401 N.E.2d 318, 320.) The credibility of witnesses and the reliability of the identification were matters founded upon observation of such factors as demeanor and strength under cross-examination, matters to be decided by the jury free of improper guidance.

### PRETRIAL PROCEDURES

There are procedural issues of constitutional dimension which must be considered because they will bear on the new trial. When the defendant before trial raised the question of constitutional admissibility of evidence, the trial court should have granted him hearings on his motions to suppress. Proper pretrial hearings must be afforded on the remand.

## THE ARREST AND THE LINEUP

■■ Both sides agree that if it was invoked, *People v. Mordican* (1976), 64 Ill. 2d 257, 356 N.E.2d 71, required that a second hearing be held on the validity of Sampson's arrest for rape. *Mordican* grew out of the opinion in *People v. Hopkins* (1972), 52 Ill. 2d 1, 284 N.E.2d 283, and held that even if a defendant's motion to suppress had been denied when litigated in an earlier trial, that defendant was entitled to a new hearing if that earlier trial had ended in acquittal and foreclosed the possibility of appeal of the suppression ruling. It is conceded that the validity of Sampson's arrest was litigated in his earlier trial for the rape of another person. A new hearing was necessary if Sampson in his pretrial motions to suppress in this case continued to challenge both the validity of his arrest for rape and the admissibility of the lineup identification as the fruit of the arrest.

The State's position is that Sampson never invoked the *Mordican* doctrine because his challenge was only to the validity of his arrest for a sticker violation, and he failed to put into issue in this case whether there was probable cause to arrest for rape. It is true that in his actual motion seeking to suppress the identification Sampson stated no ground for the invalidity of the arrest. But he attached to his motion a petition which related the reason for the arrest given by the arresting officer and charged that it was a ruse. These documents were accompanied by a memorandum of law in which Sampson argued that even beyond the misconduct of a ruse arrest the police acted without probable cause to arrest for rape. Different motions and petitions were later filed at the suggestion of the trial judge, but the memorandum remained in the record. The defendant thus adequately put the court and the State on notice of his challenge to the existence of probable cause to effect his arrest on a rape charge.

The State also argues that the defendant did not raise the issue in his written post-trial motion. Defendant moved for a new trial following conviction because of the trial court's error in denying the motion to suppress the fruits of the illegal arrest. This called the attention of the trial court and this court to the issue once again; it adequately preserved the issue for review. We are satisfied that the *Mordican* doctrine was invoked.

The State seeks to support the denial of the motion to suppress the lineup identification, without a hearing on the legality of the arrest on the ground that as a matter of law even if the arrest was illegal, the lineup identification was not the fruit of the arrest. The validity of the arrest would then be irrelevant to defendant's trial. The question in defining the fruit of illegal police conduct is whether the evidence was obtained by exploiting the primary illegality rather than by means sufficiently distinguishable to be purged of the primary taint. (*Wong Sun v. United*

*States* (1963), 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 445, 83 S. Ct. 407, 417.) Four factors should be considered—the temporal proximity of the illegality to the fruit, the presence of intervening circumstances, the purpose and flagrancy of the police misconduct and the presence or absence of *Miranda* warnings. *Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427-28, 95 S. Ct. 2254, 2261-62; *People v. Gabbard* (1979), 78 Ill. 2d 88, 95-96, 398 N.E.2d 574, 577.

The record does not show that *Miranda* warnings were given. The police misconduct appears to have been purposeful, as the arresting officer's testimony demonstrated; repeated, as the earlier break-in of a suspect's home showed; and flagrant. No one informed Sampson of the offense for which he was being arrested without a warrant, as required by section 103—1(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 103—1(b)). The lineup followed the arrest by only a few hours. There was no intervening presentation of the defendant before a magistrate, as contemplated by section 109—1(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 109—1(a)) (see *Johnson v. Louisiana* (1972), 406 U.S. 356, 365, 32 L. Ed. 2d 152, 161, 92 S. Ct. 1620), and thus no attenuation. An independent source for the identification was lacking. What took place was nothing more than an ordinary lineup following an arrest; as a matter of law it was the fruit of the arrest. *United States v. Crews* (1980), ___ U.S. ___, 63 L. Ed. 2d 537, 100 S. Ct. 1244.

The State contends that none of this matters for given the amount of information the police had, Sampson's eventual arrest was inevitable. The inevitable discovery exception to the fruit of the poisonous tree doctrine was recognized in *United States v. Crews* (1980), ___ U.S. ___, 63 L. Ed. 2d 537, 544-45, 100 S. Ct. 1244, 1249, citing *United States ex rel. Owens v. Twomey* (7th Cir. 1974), 508 F.2d 858, 865. But, the purpose of the exclusionary rule—the deterrence of illegal police conduct—is not well served when courts refuse to suppress evidence on the ground that even though police obtained evidence unconstitutionally, they *could* have obtained the evidence through unobjectionable procedures. In determining the admissibility of fruits of illegal searches or seizures, courts must consider what actually happened, not speculate about what might have occurred, for "the rights * * * against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way." *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 392, 64 L. Ed. 319, 321-22; see also *Arkansas v. Sanders* (1979), 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586; *United States v. Massey* (M.D. Fla. 1977), 437 F. Supp. 843, 853-54.

The inevitable discovery exception has been applied only where police inevitably would have discovered the data contained in the

illegally seized evidence from a public independent source, one which could be tapped without invading anyone's privacy. For example, police often possess important data in a case in their files, but have not made the logical connection that would bring it to bear on the present investigation. Instead of a careful perusal of the information already gathered, they may illegally gather some duplicative evidence. If this illegal conduct was superfluous, the State may present at trial the evidence that diligent investigation would have uncovered without venturing into protected areas of privacy. (See, *e.g.*, *People v. Stinson* (1976), 37 Ill. App. 3d 229, 233, 345 N.E.2d 751, 754 (evidence of credit card charges not excluded despite discovery violation because the information in question was in State's possession and would have been uncovered in any event by reasonable care in preparing State's case); *People v. Horton* (1977), 49 Ill. App. 3d 531, 532-33, 364 N.E.2d 551, 553 (fingerprint identification allowed where illegal arrest generated a suppressible fingerprint of defendant but police already had a fingerprint of defendant in files and reason to connect the defendant with the offense); *People v. Williams* (1978), 62 Ill. App. 3d 874, 880, 379 N.E.2d 1222, 1227 (police had defendant's fingerprints and reason to connect him with the offense); *United States ex rel. Owens v. Twomey* (7th Cir. 1974), 508 F.2d 858, 866 (police learned identity of a State's witness through legal interrogation of victim and did not need to use her address in a booklet seized in an illegal search).) Where, however, the defendant's presence in a lineup is a direct consequence of his being taken into custody, the method of seizure is not superfluous, and, if the seizure was improper, lineup identification must be suppressed. (*People v. Holdman* (1977), 51 Ill. App. 3d 484, 490, 366 N.E.2d 993; *People v. Hornal* (1975), 29 Ill. App. 3d 308, 317, 330 N.E.2d 225.) "The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality." *Crews*, ___ U.S. ___, ___, 63 L. Ed. 2d 537, 548, 100 S. Ct. 1244, 1252.

■■ Unlike these cases, Sampson's presence in a lineup to be viewed by the victim was not something already in police possession, and his arrest was not superfluous because the arrest was what led to his presence in the lineup. The inevitable discovery exception as it has been used does not apply here, and we see no reason to extend it. The lineup identification was the fruit of the arrest and consequently stands or falls with its legality. Since it is not possible to determine as a matter of law that the lineup identification should be admitted, the *Mordican* doctrine requires that a hearing be held on the legality of the arrest.

### THE PHOTOGRAPHS

■■ The trial court should not have denied the motion to suppress the

photographs without a hearing. The trial judge felt that the defendant did not establish a case for suppression because *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, does not apply to photographs. But in view of the facts of this case the *Miranda* violation did not affect the admissibility of the photographs. If the arrest was illegal because made without probable cause to arrest for rape, then the photographs were the fruits of that arrest and the presence of *Miranda* warnings would have made no difference. (*Brown*, 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261.) If the arrest was legal, then Sampson was properly in police custody and subject to strip search incident to the custodial arrest. (*United States v. Klein* (1st Cir. 1975), 522 F.2d 296, 300-01.) The police access to Sampson's growth would be a source independent of the *Miranda* violation for the photographs. As a matter of law the inevitable discovery exception, provided that the State establishes by a preponderance of evidence that discovery was inevitable, could be applied to justify admission into evidence of the fruits tainted by the failure to give *Miranda* warnings, assuming no such warnings were given. (*People v. Wilson* (1975), 60 Ill. 2d 235, 237-38, 326 N.E.2d 378, 380; *Commonwealth v. White* (Mass. 1977), 371 N.E.2d 777, *aff'd by an equally divided court* (1978), 439 U.S. 280, 58 L. Ed. 2d 519, 99 S. Ct. 712.)) We note that if the arrest had actually been supported only by probable cause to arrest for a sticker violation, a strip search would then have been improper, there would have been no inevitable discovery exception and the photographs would have been inadmissible. *People v. Seymour* (1979), 80 Ill. App. 3d 221, 231, 398 N.E.2d 1191, 1198.

As pointed out above, the legality of the arrest has not been adjudicated in this case, and a hearing on the issue must be held in the trial court.

### THE LINEUP PROCEDURE

The trial court denied the defendant leave to file his motion to suppress the lineup identification as the product of suggestive procedures because the motion was filed on the morning of trial. The trial judge's concern with delay was proper. Were this court to pass on the substance of the ruling, we would hold that the defense counsel was not put on notice that the victim had failed to make a positive identification at the lineup by the report first tendered by the State in discovery. Only when it received the second report showing that there had been no immediate positive identification at the time of the lineup could the defense reasonably be expected to realize this; its motion was therefore timely. But as a practical matter it is not necessary to address the issue directly. It has now been 5½ years since the crime was committed and a new trial must still be held. Consideration of this motion on remand along with the

other pretrial motions would not mean an unreasonable delay in the trial. The trial court's ruling is vacated with directions to grant the defendant a hearing on the motion.

SENTENCING

Because the defendant must receive a new trial, it is not necessary to determine whether his sentence was excessive.

Judgment reversed and remanded for a new trial and further proceedings consistent with this opinion.

· McNAMARA and RIZZI, JJ., concur.