THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY DAVIS, Defendant-Appellant.

First District (6th Division)   No. 1—06—3748

Opinion filed June 26, 2009.

Michael J. Pelletier, Patricia Unsinn, and Maya Szilak, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, Douglas P. Harvath, and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County defendant, Timothy Davis, was found guilty of first degree murder and sentenced to natural life imprisonment. On appeal, defendant asserts that we should reverse his conviction and remand for a new trial on three grounds. First, he contends that the trial court denied him his rights to due process and to cross-examine witnesses against him when it improperly answered a jury question during jury deliberations in such a manner so as to provide unsworn testimony to the jurors on a critical factual issue. Second, defendant contends that during opening and closing arguments, the State made improper and prejudicial comments regarding defendant's prior criminal background so as to imply that defendant had a propensity for crime. Third, defendant argues that he was denied his right to intelligently and knowingly waive his right to testify when the trial court refused to rule on his motion *in limine* to preclude the use of a murder conviction as impeachment evidence, until after defendant testified at trial. Defendant also contends on appeal, and the State concedes, that the mittimus must be corrected to reflect that he was convicted of one count of first degree murder instead of two under the "one-act, one-crime" rule. For the reasons that follow, we reverse and remand for a new trial.

## I. BACKGROUND

On January 22, 2003, defendant was charged with six counts of first degree murder for his involvement in the shooting of the victim, Brian Henderson, on June 1, 2001, near the corner of Augusta Boulevard, and Pulaski Avenue in Chicago. The victim died 22 days later, on June 23, 2001, from complications arising from his gunshot wounds. At the time of the shooting defendant was 16 years old.

On February 22, 2006, defendant filed a motion to suppress inculpatory statements he had made to the police on May 3, 2002, and after a hearing, that motion was denied by the trial court. No claim was ever made, nor evidence presented, of any bargains, coercive or otherwise, made with defendant in return for his inculpatory statements at that hearing, or for that matter at trial.

On September 18, 2006, immediately prior to the commencement of his jury trial, defendant filed a motion *in limine* to preclude the State from introducing his prior unrelated murder conviction as impeachment evidence in the event that he chose to testify at trial. The trial court, however, indicated that it would reserve ruling on defendant's motion until after defendant testified at trial, if he chose to testify at all, which he ultimately chose not to do. The trial court then proceeded with jury selection.

During jury selection, the trial court, *inter alia*, read to the potential jurors the murder charges brought against defendant, but informed them that this was not a death penalty case. Specifically, the trial court stated:

"The defendant is charged with first degree murder. I will inform all of you in the jury box and anyone in the gallery that this is not a death penalty case, so anyone who has qualms or reservations about the death penalty, this is not a case in which the death penalty is being sought, and should there be a verdict of guilty I will be sentencing the defendant just for your own peace of mind or clarification."

During trial, the parties presented the following evidence. The State first called Chicago police officer Gilbert Espinoza, who testified that at about 10:25 p.m. on June 1, 2001, together with his partner Officer Eddie Carroll, he was instructed to proceed to 4022 West Augusta Boulevard where a man had been shot. Approximately five minutes later, Officer Espinoza arrived at the scene and observed a man with a gunshot wound lying on the ground and bleeding. Officer Espinoza immediately called for an ambulance and had the victim, Brian Henderson,[1] transported to Mt. Sinai Hospital. Officer Espinoza remained on the scene, attempting to locate witnesses, and eventually spoke to two individuals who witnessed the shooting, and who provided the officer with a description of the offender.

On cross-examination, Officer Espinoza acknowledged that the description of the offender, which he obtained from the two witnesses, revealed that he was an African American male in his teens, approximately 6 feet, 150 pounds, wearing a gray shirt, gray hat and white jeans.

The State next called two eyewitnesses, Sophia Allen and her cousin, Robin Moss. Both women testified at trial that they saw defendant shoot the victim somewhere between 10 p.m. and 10:30 p.m. on June 1, 2001, at 4022 West Augusta Boulevard. Allen averred that she knew defendant from the neighborhood, that they grew up together, and that defendant's mother sometimes babysat her children.

With respect to the events of June 1, 2001, Allen specifically testified that at approximately 10:30 p.m. on that date, she was inside the liquor store on the corner of Pulaski Avenue and Augusta Boulevard with her cousin when she observed the victim enter the store. Soon thereafter, defendant's mother, Eva, entered the store as well. Accord-

---

[1]Officer Espinoza discovered the victim's name only later that evening when he went to Mt. Sinai Hospital, where he spoke to the attending physician.

ing to Allen, the victim was standing in line to purchase items, when defendant, and one of defendant's friends (Chris), came into the store and "cut the line" in front of the victim. An argument broke out between defendant and the victim about who would purchase items first. Allen, her cousin Moss, and defendant's mother all attempted to diffuse the situation and calm defendant down, asking him to leave the store and "go on about his business." Allen then left the store with defendant's mother and the victim, but remained on the store's front steps talking. When defendant exited the store, he and the victim started arguing again, and defendant leaned toward the victim, pointed his finger at the victim's face and said that he would "shoot the sh-- out of him." Allen averred that, at that point, defendant's friend, Chris, drove up in a purple Dodge Intrepid, exited the car and whispered something in defendant's ear, and the two left, walking in the direction of the Intrepid. According to Allen, the victim also left the store and started walking up the street.

At this point it started to rain. As Allen opened her umbrella, she saw gunshots flashing and the victim running back toward the store. Allen observed defendant running and shooting after the victim, and then the victim's body jerking as he fell to the ground. According to Allen, as the victim was attempting to roll over, defendant approached him and fired the rest of the shots into his already wounded body. Defendant ran away, and Allen ran toward the victim to help him.

On cross-examination, Allen admitted that she was approximately 40 feet away when she observed defendant shooting the victim, that it was dark outside and that she had her umbrella in front of her as it had started to rain.

On cross-examination, Allen also testified that after the ambulance arrived at the scene and took the victim to the hospital she had occasion to speak with the police. Allen admitted, however, that at that time she gave the police a fake name "Tasha Bijou," and told them she knew nothing about the shooting. Allen explained, however, that a few weeks later, she spoke to the police again and told them the truth. She averred that she lied to the police initially because she was "scared," and implied that she had been threatened by someone not to disclose what she knew.[2]

On cross-examination, Allen further admitted that her statements to the police two weeks after the shooting were inconsistent with some

---

[2]The following colloquy took place:
    "[THE STATE]: *** [W]hen you first talked to the police that evening you *** said that you had lied to them about your name.
    [ALLEN]: Yes.

of her testimony at trial. Specifically, Allen acknowledged that she had then told the investigating officers that it was dark and raining outside and that it was not until she ran over to the man who had been shot that she realized it was the victim, Brian Henderson.

Robin Moss was the second eyewitness called by the State. Her testimony was consistent with the testimony of her cousin Sophia Allen. On cross-examination, Moss admitted that after she called the ambulance, she left before the police arrived and went to Allen's house on the corner of Keystone Avenue and Augusta Boulevard. Just like Allen, Moss admitted that on the night in question she did not voluntarily tell the police that she saw defendant shoot the victim.

Officer Michael Kapior next testified that at approximately 10:25 p.m. on June 1, 2001, together with Officers John Lipka and Roy Isaacson, he responded to a report of a shooting at 4022 West Augusta Boulevard. Once at the location, Officer Kapior observed the victim on the ground and numerous bystanders that had gathered in the area. Officer Kapior testified that an older woman approached him and provided him with a description of a man she had observed fleeing from the scene.

After obtaining this description, Officer Kapior toured the area in his squad car and soon thereafter observed a black male teenager sitting on the porch of 1036 N. Keystone Avenue, with a bottle of liquor in his hand, fitting the description of the offender. Officer Kapior made an in-court identification of defendant as that individual. Officer Kapior said that together with his partners he exited the vehicle and approached defendant. Defendant fled up the stairs of the house and was chased down by the officers and placed under arrest for drinking as a minor.

On cross-examination, Officer Kapior acknowledged that he did not write down the names of any of the bystanders that he observed

---

[THE STATE]: And you also have testified that you didn't tell them everything that you saw, is that correct?
[ALLEN]: Yes.
[THE STATE]: And why is that?
[ALLEN]: Because I was scared because when I got home there was—
[DEFENSE COUNSEL] Ms. Brown: Objection.
THE COURT: Sustained.
[THE STATE]: What were you afraid of?
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled.
[ALLEN]: I was afraid because there was a threat at home.
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled. The answer may stand."

at the scene of the crime or the name of the older woman who had given him a description of the offender.

On cross-examination, Officer Kapior also admitted that he never found a gun on defendant and that he did not attempt to inventory defendant's clothes to preserve them for the evidence technician to examine for gunshot residue.

The State next called Detective Sam Cirone, who testified that he was one of the detectives assigned to investigating the shooting that had occurred on June 1, 2001. Detective Cirone averred that on August 29, 2001, as part of his investigation he interviewed Sophia Allen, who told him that she observed defendant shoot the victim. As a result of his conversation with Allen, on December 18, 2002, Detective Cirone placed defendant under arrest. At that time defendant was in a holding facility in Racine, Wisconsin, under arrest for an unrelated drug charge.[3]

On cross-examination, Detective Cirone acknowledged that if he had been asked to describe defendant, on the date when he made his arrest, he would have stated that defendant was about 5 feet 6 inches tall and that he weighed approximately 135 pounds.[4]

Detective Cirone further testified that approximately a year after the shooting, on May 3, 2002, he had occasion to interview defendant, together with his partner Mike Cronin, inside the Milwaukee County House of Corrections.[5] Detective Cirone stated that the interview commenced at approximately 7:30 p.m. Prior to interviewing defendant, he advised defendant of his *Miranda* rights. Defendant indicated that he understood those rights and that he wished to speak to police. Detective Cirone next related what defendant told him about his involvement in the murder of the victim. According to Detective Cirone defendant told the police that he was a member of the Imperial Insane Vicelords street gang. On the night in question, defendant was inside the liquor store located on the corner of Augusta Boulevard and Pulaski Avenue, when the victim bumped into him and they entered into a verbal argument. Defendant told Detective Cirone that he recognized the victim to be a member of the One-Way street gang, a rival street gang that was currently at war with the Imperial Insane

[3]The jurors were instructed that evidence that defendant was in custody for an unrelated drug charge could be considered only for purposes of assessing the circumstances under which defendant had been questioned by police.

[4]This testimony contradicted the testimony offered previously by Officer Espinoza that on the night in question he had obtained a description of the offender as being a black male, 6 feet tall, weighing about 150 pounds.

[5]Defendant was in the Milwaukee County House of Corrections serving time on an unrelated drug charge.

Vicelords, and that he wanted to kill him. Defendant therefore ran to the corner of Keystone Avenue and Augusta Boulevard where he observed one of his friends, who, he believed, carried a gun. Defendant obtained the gun from his friend and positioned himself near the corner of Keystone Avenue and Augusta Boulevard in such a manner that he could not be seen by anyone walking westbound on Augusta Boulevard. Defendant waited in ambush for the victim, and when the victim approached, he jumped out and fired a shot. Defendant told Detective Cirone that the victim turned around and tried to run toward Pulaski Avenue, but that defendant continued to shoot at him, firing a total of about four to five shots. Afterwards, defendant ran back to his house at 1036 N. Keystone Avenue, and handed the gun back to his friend.

Detective Cirone testified that after he spoke with defendant he contacted the assistant State's Attorney's office and requested that a prosecutor be sent to the Milwaukee County House of Corrections so that a formal statement by defendant could be made. Later that night, Assistant State's Attorney (ASA) Marie-Rose McManus arrived at the jailhouse, whereupon defendant made a handwritten statement.

On cross-examination, Detective Cirone admitted that when he questioned defendant in the holding room inside the Milwaukee jail, defendant had been escorted into that room by a corrections officer and was not free to leave the jail. Detective Cirone also admitted that the door to the room was closed during the interrogation. Detective Cirone acknowledged that he did not have defendant sign a written waiver of his *Miranda* rights, nor did he attempt to contact defendant's attorney prior to speaking with defendant, even though he was aware that defendant was only 17 years old at the time and had obtained only a ninth-grade education. Detective Cirone also admitted that he did not record or videotape the interrogation or take notes during the interrogation or give defendant the opportunity to write out a statement in his own words.

Former ASA Marie-Rose McManus next testified that at about 7 p.m. on May 3, 2002, she was assigned to go to the Milwaukee County House of Corrections to interview defendant. Once there, McManus met up with Detectives Cirone and Cronin and together with them proceeded to speak with defendant in an interview room inside the jailhouse. McManus testified that the interview began a little after midnight and that it lasted about an hour. Prior to the interview, McManus informed defendant that she was a prosecutor and not his attorney and she then proceeded to advise him of his *Miranda* rights. Defendant indicated that he understood his rights and that he wanted to speak with McManus. According to McManus, defendant's statement was later memorialized in writing.

On cross-examination, McManus admitted that even though she was aware that defendant was 17 years old at the time, she did not attempt to facilitate the presence of a defense attorney prior to interviewing defendant. McManus also acknowledged that she did not attempt to tape record or videotape defendant's statement or to have a court reporter present during the writing of the statement. She averred, however, that these services were unavailable to her because she was in Milwaukee. McManus also acknowledged that she did not give defendant the opportunity to write out the statement in his own words. Rather, the handwritten statement was hand written by McManus and signed by defendant, and it represented only a summary of defendant's actual statement to police.

Defendant's handwritten confession was next read to the jury.[6] In that statement to police, defendant first acknowledged understanding and waiving his *Miranda* rights. He also indicated that he had been advised that ASA McManus was a prosecutor and not his attorney, and that he was informed that although he was 16 years old at the time of the shooting he would be tried as an adult. Defendant finally stated that he was giving his statement freely and voluntarily and that no promises or threats were made to him in exchange for the statement.

With respect to defendant's involvement in the shooting of the victim on June 1, 2001, defendant stated that on the day in question he was at home with his cousin, Chris Davis, and a number of friends (including, *inter alia*, Corron Cobbins, Deshaun King, and two men whose real names he did not know, but who went by Cha Cha, and Shug). All six of them decided to go to the liquor store on the corner of Augusta Boulevard and Pulaski Avenue, so Cha Cha drove them there in his green Ford Explorer. Once at the store, everyone went inside, and defendant had someone, older than 21 years of age, buy him whiskey. Defendant then left the store and stood in front of the entrance talking with friends.

According to defendant's statement, "while he was talking, someone bumped into him and [defendant] looked up and recognized the guy as a One-Way gang member, a rival gang to the Imperial Insane Vice Lords who [defendant] hangs out with." Defendant did not know the man's name, but when shown a photo of the deceased victim, indicated that this was the man who bumped into him. According to defendant's statement, when the victim bumped into him, he called

---

[6]The statement was taken on May 3, 2002, at 1:25 a.m. at the Milwaukee County House of Corrections in the presence of ASA Marie-Rose McManus and Detectives Sam Cirone and Mike Cronin.

defendant a "bitch ass." Defendant did not like the victim because the victim was a One-Way gang member, and defendant stated that the first thought that came to his mind was to get a gun and kill him.

Defendant told police that he then ran west on Augusta Boulevard where he encountered DeShaun King, whom he knew by the name of "Shaky." Defendant asked DeShaun for a gun, which he knew DeShaun carried with him. DeShaun gave the gun to defendant and walked away. Defendant next stood next to a gate so that anyone coming down Augusta Boulevard could not see him, and waited there. Defendant could see that the victim was coming down Augusta Boulevard and that he was carrying a bag from the liquor store.

According to defendant's statement, when the victim approached the corner where defendant was standing, defendant stepped out into the street and started shooting. Defendant could not recall how many times he shot at the victim but estimated that it was about four or five times. Defendant saw the victim stumble and then turn from him and run toward the liquor store, where he eventually fell to the ground.

Defendant next told police that he ran west on Augusta Boulevard. At Keystone Avenue, he ran into Shaky again and returned the gun, so that Shaky could hide it. Defendant then went to his home at 1036 N. Keystone Avenue and sat on the porch, where he took off his shirt and hung it on the bannister. The police came a couple of minutes later.

The State next presented evidence that the victim died in the hospital 22 days after the shooting. The State also presented evidence that the following day, on June 24, 2001, at 8 a.m., Dr. Aldo Fusaro performed an autopsy on the victim's body. During the autopsy, Dr. Fusaro discovered three gunshot wounds on the victim's body and recovered two of those bullets from the body. Dr. Fusaro concluded that the victim died from the three sustained gunshot wounds as a result of complications arising from "multiple organ system failure."[7]

The State next called forensic investigator Patrick Moran, who testified that on June 2, 2001, together with his partner Joe Dunigan, he proceeded to the crime scene at 4022 West Augusta Boulevard to investigate the shooting that had occurred there the night before. Moran testified that he took photographs of the scene and recovered a bullet from the sidewalk near the victim's grocery bag. Aaron Horn, a

---

[7]Dr. Fusaro's autopsy report revealed that: the first bullet entered the victim's left lateral chest wall and fractured a rib as it went through the chest cavity and exited the victim's body; the second bullet went into the victim's abdominal wall and injured his right kidney, remaining inside the body; and the third bullet perforated the victim's back, remaining inside the body.

forensic scientist with the Illinois State Police and a specialist in firearms identification, testified that he analyzed the two bullets recovered from the victim's body and the bullet found at the crime scene and concluded that all three bullets were fired from the same .44-caliber revolver. On cross-examination, Horn testified that unlike a semiautomatic gun, which expels spent bullet casings as it is fired, a revolver retains casings, but that no casings were given to him for examination.

After the State rested, the defense proffered no evidence at trial, and both parties proceeded with closing arguments.

On September 19, 2006, at 3:25 p.m., the jury began its deliberations. During deliberations, the jury sent out six notes to the trial court. At 5:13 p.m. the jury sent out its first question to the trial court asking, "What do we do if we seem to be at an impasse?" The trial court instructed the jury simply with "Please continue your deliberations." At 6 p.m. the jury sent out a second note, stating "We have taken four votes and still seem to be at an impasse. May we stop today and return tomorrow?" The court instructed the jury to continue to deliberate. At 6:35 p.m., the jury sent a third question to the trial court, stating "Your Honor, please let us know if there is a legal [or beyond the scope of this trial] reason that we did not hear from either party about subsequent questioning/whereabouts of Shakey or Chris ([defendant's] cousin)." The record does not indicate what response was given to this question, and the parties agree that upon contacting the official court reporter, appellate counsel was informed that no transcript was made of the response to this jury question. At 7:45 p.m., the jury sent out a fourth note, indicating that one of the jurors was concerned that he or she would not be able to obtain a bus home due to the late hour. The court informed the jury that transportation would be provided. At 8:23 p.m., the jury sent its fifth note to the trial court stating, "We are at an impasse for tonight." The trial court sequestered the jurors for the night and instructed them to stop deliberating until the next morning.

The next day, September 20, 2006, the jury resumed deliberations. At 11:30 a.m., the jury sent out its sixth and last note to the trial court, stating: "We, the jury, would like to know if the death penalty was taken off the table in order for Tim [defendant] to confess." In the presence of both the State and defense counsel, the trial judge indicated that she intended to instruct the jury by responding with "No, please continue your deliberations, jurors." In doing so, the trial judge first stated that when she instructed the jury in opening remarks she told them that this was not a death penalty case. She further explained:

"For the record, there is no evidence or allegations that the death penalty was taken off the table at any time. The defendant was 16, not eligible for the death penalty and no allegations that the defendant was told to confess in order to spare himself the facing of the death penalty."

Defense counsel objected to this instruction and instead urged the court to respond with "You've heard the evidence, please continue your deliberations." Over counsel's objection, the court instructed the jury with "No, please continue your deliberations, jurors." At 11:50 a.m., less than 20 minutes after receiving this instruction, the jury informed the court that it had reached a verdict.

Defense counsel immediately moved for a mistrial based on the court's response to the jury's final inquiry. The trial court denied the motion, stating:

"Based on the arguments that the Court heard alongside the jury, [I] find there was [sic] no violations of the defendant's rights or improper arguments made. ***

Again I did speak about the death penalty to the jurors and there was no evidence either at trial or of motions that the Court heard prior to the trial regarding the death penalty that were mentioned, never on the table and I stand by my response to the jury. I believe the case law will support me when questions by the jury can be answered the Court has an obligation to answer it."

The jury found defendant guilty of both murder charges.

On November 14, 2006, defense counsel filed a motion for a new trial arguing, *inter alia*, that defendant had been prejudiced by the court's response to the jury's final inquiry during its deliberations. The court denied this motion, reiterating that it believed its response to the jury's final inquiry had been proper because there was no evidence or allegation that the death penalty had been taken off the table to get defendant to confess. Specifically, the trial court stated:

"The jurors did send out a note at 11:30 on September 20 asking if the death penalty had been taken off the table in order for defendant to confess.

There was never any argument made by either side of this. It was never raised in the pretrial motions to suppress the statements. There was never any evidence or allegations of that. The court did state at that time when I was instructing, addressing the venire in opening remarks, I did tell them that this was not a case in which the State was seeking the death penalty, and because of that I did respond, no, please continue your deliberations.

It was by inartful words, I believe, that could have caused them to think that the State was not seeking the death penalty as opposed to telling the jurors that this was not a death penalty case.

And it was in fact not a death penalty case because of the defendant's age and no other reason.

Although, I should say, perhaps if he was old enough the State, it would be within their discretion, whether or not to seek death, but I did answer that question, and I believe it was proper.

*Again, there was not [a] scintilla of evidence that the death penalty was taken off the table in order to get the defendant to confess.* So I believe I was proper in answering that question, and I believe that the Appellate Court upheld that when it is possible for a judge to answer a question, we should in fact answer that question. And I did tell them to please continue their deliberations." (Emphasis added.)

The trial court subsequently sentenced defendant to natural life imprisonment, and entered a mittimus reflecting convictions for two counts of murder. Defendant now appeals.

## II. ANALYSIS

On appeal defendant challenges his convictions on three separate grounds, asserting that: (1) the trial court denied him his rights to due process and to cross-examine witnesses against him when it improperly answered a jury question during jury deliberations in such a manner so as to provide unsworn testimony to the jurors on a critical factual issue; (2) he was denied his right to intelligently and knowingly waive his right to testify when the trial court refused to rule on his motion *in limine* to preclude the use of his prior murder conviction as impeachment evidence until after he chose to testify[8]; and (3) the prosecutor made improper and prejudicial comments during opening and closing arguments regarding defendant's prior criminal background so as to infer that defendant had a propensity for crime.[9]

---

[8]We note that since the briefs of the parties to this appeal have been filed, our supreme court has specifically spoken on this issue, effectively neutralizing defendant's argument insofar as defendant here did not testify at trial so as to be able to assert prejudicial error. See *People v. Patrick*, 233 Ill. 2d 62, 77-78 (2009), citing *Luce v. United States*, 469 U.S. 38, 41-43, 83 L. Ed. 2d 443, 447-48, 105 S. Ct. 460, 463-64 (1984) (holding that "a defendant who did not testify at trial was not entitled to a review of the trial court's denial of a motion *in limine* seeking to exclude his prior convictions," because "any possible harm flowing from the trial court's denial of a motion *in limine* to bar impeachment by a prior conviction is wholly speculative absent the defendant's testimony and the prosecution's attempt to impeach the defendant through use of the prior convictions"). As such, because we reverse and remand on other grounds, we need not address this issue in further detail.

[9]Defendant also contends, and the State concedes, that the mittimus must be corrected to reflect that he was convicted of one count of first degree murder instead of two under the "one-act, one-crime" rule.

### 1. Trial Judge's Response to the Jurors' Final Question

The issue of overriding concern is that of the trial judge's response to the question of the jury regarding "removal of the death penalty off the table," and we therefore address it first. With respect to this contention, defendant specifically complains of the following communication that occurred between the judge and jury, contending that it deprived him of his right to a fair trial. On the second day of deliberations, after being sequestered overnight and previously indicating to the judge that they were at "an impasse," the jurors sent out the following note asking the judge: "We, the jury, would like to know if the death penalty was taken off the table in order for Tim [defendant] to confess?" Over defense counsel's objection, the trial court responded: "No, please continue your deliberations."

Defendant asserts that because no testimony was elicited at trial as to whether the death penalty had been used to elicit a confession from defendant, the trial court committed reversible error when it responded to the jury's question in the manner that it did, thereby submitting new facts into evidence that had not been presented to the jury at trial. Defendant further argues that because his theory of the case predominantly rested on discrediting the reliability of the confession he made to police, the trial judge essentially usurped the jury's function and deprived him of his right to have the jury decide how much weight to accord his confession.

The State contends, on the other hand, that the trial court acted within its discretion when it responded to the jury's question in the manner that it did, because the question essentially concerned matters of law rather than fact. Specifically, the State attempts to argue that the subject of the jury's inquiry was defendant's eligibility for the death penalty, which is a question of law insofar as it would have impacted on the voluntariness of defendant's confession. We disagree with that characterization of the jurors' question.

It is well established that "[t]he circuit court has discretion in determining how best to respond to a jury question, and this court will review any such response for an abuse of discretion." *People v. Averett*, 381 Ill. App. 3d 1001, 1012, 886 N.E.2d 1123, 1133 (2008), citing *People v. Sanders*, 368 Ill. App. 3d 533, 537, 857 N.E.2d 948, 952 (2006); *People v. Reid*, 136 Ill. 2d 27, 38-39, 554 N.E.2d 174, 179 (1990). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20, 743 N.E.2d 126, 138 (2000).

■ In Illinois, jurors are entitled to have their questions answered (*Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179), and the trial judge has a

duty to provide instruction to the jury where the jury has posed an explicit question on a point of law arising from facts over which there is doubt or confusion (*People v. Kliner*, 185 Ill. 2d 81, 163, 705 N.E.2d 850, 891 (1998), citing *People v. Childs*, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534, 539-40 (1994)). However, our supreme court has carved out an exception to this rule, holding that a trial court may, in its discretion, properly decline to answer a jury's inquiries in the following four scenarios: (1) where the instructions are readily understandable and sufficiently explain the relevant law; (2) where further instructions would serve no useful purpose or would potentially mislead the jury; (3) where the jury's inquiry involves a question of fact; or (4) where if providing an answer would cause the court to express an opinion which would likely direct a verdict one way or another. *Kliner*, 185 Ill. 2d at 163, 705 N.E.2d at 891; *Childs*, 159 Ill. 2d at 228-29, 636 N.E.2d at 539-40; *Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179. Our supreme court has further specified that a trial judge has no right to answer a question asked by the jury that calls for him to reach a conclusion on his view of the evidence. *People v. Williams*, 60 Ill. 2d 1, 12-13, 322 N.E.2d 819, 825-26 (1975), *overruled on other grounds*, *People v. Smith*, 183 Ill. 2d 425, 432, 701 N.E.2d 1097, 1100 (1998).

The rationale for this exception is that a trial judge may not abandon his role as a neutral referee or usurp the jury's function as the trier of fact. *People v. Tirado*, 254 Ill. App. 3d 497, 506, 626 N.E.2d 1114, 1121 (1993), *overruled on other grounds*, *People v. Woodrum*, 223 Ill. 2d 286, 860 N.E.2d 259 (2006); see also *People v. Bell*, 113 Ill. App. 3d 588, 598, 447 N.E.2d 909, 916-17 (1983); see also *People v. Papas*, 381 Ill. 90, 96, 44 N.E. 896, 898-99 (1942) ("In a case tried by a jury it is the province of the jury, not the judge, to decide the guilt or innocence of the accused"); see also *People v. White*, 241 Ill. App. 3d 291, 298-99, 608 N.E.2d 1220, 1226 (1993) ("In criminal proceedings, an accused is entitled to a fair trial by a jury. A fair trial contemplates that the jury alone will fulfill its duty of determining the facts. [Citation.] The ultimate decision of fact must be fairly left to the jury. Judges must refrain from communicating to the jury their personal opinion concerning any disputed fact"); see also *People v. Tyner*, 30 Ill. 2d 101, 104, 195 N.E.2d 675, 677 (1964) ("Rarely, if ever, is a judge called upon to comment on the evidence during trial *** and under no circumstances should [the judge] express an opinion as to its veracity, for this is the province of the jury"); accord *United States v. Argentine*, 814 F.2d 783, 788 (1st Cir. 1987) ("The Constitution casts judge and jury in mutually supporting—yet nevertheless distinct—roles. Undeniably inherent in the constitutional guarantee of trial by jury is the

principle that a court may not step in and direct a finding of contested fact in favor of the prosecution 'regardless of how overwhelmingly the evidence may point in that direction. The trial judge is \*\*\* barred from attempting to override or interfere with the jurors independent judgment in a manner contrary to the interest of the accused.' *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 573[, 51 L. Ed. 2d 642, 652, 97 S. Ct. 1349, 1355] (1977). Judge Aldrich has eloquently captured the essence of the point: 'Put simply, the right to be tried by a jury of one's peers finally exacted from the king would be meaningless if the king's judges could call the turn.' [Citation.]'").

Following this rationale, our courts have repeatedly found an abuse of discretion where the trial judge answers a factual question for the jury in such a manner so as to express an opinion which would likely direct the jury verdict one way or another. See, *e.g.*, *People v. Sampson*, 86 Ill. App. 3d 687, 691-92, 408 N.E.2d 3, 7-8 (1980) (holding that the judge's negative response to the jury's inquiry seeking explanation as to "what [actually] happened," by asking the court whether a certain chain of events in the witnesses' testimony was the correct version of events, was made in error and usurped the function of the jury, because the answer reflected the version of events offered by prosecution); *Tirado*, 254 Ill. App. 3d at 506, 626 N.E.2d at 1121 (holding that it would have been an abuse of discretion for the trial judge to substantively answer the jury's factual question of whether the pretrial hearing was held in English or Spanish, because this would resolve the evidentiary conflict regarding a central issue at trial, namely, whether defendant was conversant in English, and imprint the court's stamp of approval on the State's position that he was); accord *People v. Marsan*, 264 Ill. App. 3d 870, 874, 637 N.E.2d 540, 543 (1994) (holding that trial court properly exercised its discretion in refusing to answer jury's inquiry as to whether fingerprints could be lifted from a paper bag found at the scene of the crime, as this was a question of fact for the jury); *People v. Hooker*, 54 Ill. App. 3d 53, 60, 369 N.E.2d 147, 151-52 (1977) (holding that the court properly refused to answer jury's question regarding whether a certain type of weapon was to be considered a "dangerous weapon" because this was a question of fact for the jury); *Bell*, 113 Ill. App. 3d at 598, 447 N.E.2d at 916-17 (holding that the trial court properly refused to answer the jury's question regarding the location of defendants during the time of the shooting, despite the absence of direct testimony regarding their location, because informing the jury that there was no such "testimony" could amount to judicial oversteering and usurp the jury's function as trier of fact); *Williams*, 60 Ill. 2d at 12-13, 322 N.E.2d at

825-26 (holding that trial court properly refused to respond to the following factual questions posed by the jury: " 'Did the inside of the tape cover get fingerprinted?' " " 'Why was not the window sill in the *** bedroom dusted for fingerprints?' "); *People v. Surges*, 101 Ill. App. 3d 962, 968, 428 N.E.2d 1012, 1016-17 (1981) (holding that the trial court properly refused to answer questions from the jury asking that the trial court explain why certain individuals did not testify at trial).

■ In the present case, contrary to the State's assertion, the record reveals that the trial judge responded to a factual inquiry by the jurors. The jury posed the following question: "We, the jury, would like to know if the death penalty was taken off the table in order for Tim [defendant] to confess." Our courts have previously held that in interpreting questions from the jury, those questions " 'should be literally construed to mean just what they say.' " *Sampson*, 86 Ill. App. 3d at 691-92, 408 N.E.2d at 7-8, quoting *Williams*, 60 Ill. 2d at 13, 322 N.E.2d at 825-26. On its face, it is apparent that this question concerned the circumstances of defendant's confession to police, and not, as the State contends, the resolution of whether defendant was eligible for the death penalty under Illinois law, and that it was therefore factual and not legal in nature. The jury here did not ask the trial judge to clarify whether defendant was eligible for the death penalty, but rather inquired whether the death penalty had previously been used as a bargaining chip to induce defendant to confess to police. More overridingly, the record reveals that the trial judge herself recognized that the question posed by the jury was factual in nature, because in explaining the rationale to her response to the jury, during the hearing on defendant's motion for a new trial, the trial judge stated, "there was *not [a] scintilla of evidence* that the death penalty was taken off the table in order to get the defendant to confess." (Emphasis added.)

However, the fact that the record does not reflect that the death penalty was taken off the table merely establishes that no one contended at trial that it was used as a bargaining chip, but does not establish whether in fact the death penalty was used in such a manner. Thus, in responding to the jury's question by denying that the death penalty had in fact been used as a bargaining chip, the trial judge submitted new evidence to the jury during deliberations, bolstering the reliability of defendant's confession and thereby undermining defendant's theory of the case at trial. In that respect, the record establishes that defendant's predominant theory at trial consisted of discrediting the reliability of his handwritten confession, by attempting to show that it was either fabricated or coerced by police. As a

result, defense counsel underwent a thorough cross-examination of Detectives Cirone and ASA McManus, who participated in obtaining defendant's handwritten confession by composing a summary of defendant's version of events on the night of the shooting and then having defendant sign that statement. The record reveals, however, that no evidence whatsoever was presented during trial regarding the death penalty being used as a bargaining chip to elicit a confession from defendant. Moreover, even if defendant had not been eligible for the death penalty, a conclusion that the death penalty was not used as a bargaining chip would still constitute new evidence, since the death penalty could have been used by the police fraudulently even if unavailable. Despite this trial record, however, the trial judge nevertheless shared her own conclusions with the jury, and when asked by the jurors during their deliberations whether "the death penalty [had been] taken off the table in order for [defendant] to confess," she proceeded to give the definitive response "No."

Moreover, there is no merit in the State's contention that the trial judge's conclusion would have been justified by the fact that the judge was present during the hearing on defendant's motion to suppress, where she heard all of the evidence presented in favor of that motion, which nowhere included facts or allegations of coercion or the use of the death penalty as a bargaining chip. It is clear that the jury may not base its decision upon facts obtained at the hearing on the motion to suppress but only upon evidence presented at trial. We note, however, that the trial judge here did not purport to rely on any facts garnered at the hearing on defendant's motion to suppress, nor would such reliance be permissible. See, *e.g.*, *People v. Rivers*, 410 Ill. 410, 416-17, 102 N.E.2d 303, 306 (1951) ("The law is well settled that, exclusive of certain matters of which the court may take judicial notice, the deliberations of the trial judge are limited to the exhibits offered and admitted in evidence and the record made before him in open court. *** The defendant in a criminal proceeding has an inherent and constitutional right that all proceedings against him shall be open and notorious, and in his presence, and any inquiry or any acquisition of information or evidence outside of open court and outside of the presence of the defendant is prejudicial error. *** He has a right to rely upon his constitutional guarantee that nothing shall be considered against him except the competent evidence introduced in open court, in his presence, by the witnesses who confront him"); see also *Turner v. Louisiana*, 379 U.S. 466, 472, 13 L. Ed. 2d 424, 429, 85 S. Ct. 546, 549 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial

by jury. *** In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel"); *People v. Holmes*, 69 Ill. 2d 507, 518, 372 N.E.2d 656, 661 (1978), quoting *Rivers*, 410 Ill. at 416 (holding that any private investigation by the court " 'constitutes a denial to the defendant of the constitutional guarantee of due process of law' "). More overridingly, even if the trial judge would have been permitted to take notice of the evidence obtained at the hearing on the motion to suppress, she could not definitively state that defendant had been coerced below. The trial judge would only know that defendant had not argued at the hearing to suppress his statements that he had been coerced or induced by any promises involving the death penalty, a question that was never posed by the jury. But, she could not, as was apparently done here, make an inference for the jury that because defendant failed to argue he had been coerced in his motion to suppress, such a thing never actually occurred.

Accordingly, we find that the trial judge, as well-intentioned as she may have been, abused her discretion in responding to the jurors' question in the manner that she did. See *Sampson*, 86 Ill. App. 3d at 691-92, 408 N.E.2d at 7-8; *Tirado*, 254 Ill. App. 3d at 506, 626 N.E.2d at 1121. In that respect, we note that the trial judge should have simply declined to answer the jurors' question and responded to their inquiry, as defense counsel had urged in the first place, with, "You've heard the evidence, please continue your deliberations." See *Marsan*, 264 Ill. App. 3d at 874, 637 N.E.2d at 543; *Hooker*, 54 Ill. App. 3d at 60, 369 N.E.2d at 151-52; *Bell*, 113 Ill. App. 3d at 598, 447 N.E.2d at 916-17; *Williams*, 60 Ill. 2d at 12-13, 322 N.E.2d at 825-26; *Surges*, 101 Ill. App. 3d at 968, 428 N.E.2d at 1016-17.

The State nevertheless appears to argue that insofar as the judge's comment relates to the voluntariness of defendant's confession this should be considered a legal rather than factual issue, since it is the judge who determines the admissibility of a confession at trial.

This analysis distorts the issue with which we are presented. While we acknowledge that it is for the trial judge and not the jury to determine the legal issue of whether the circumstances surrounding a defendant's confession render that confession voluntary (*People v. Lash*, 252 Ill. App. 3d 239, 243, 624 N.E.2d 1129, 1132-33 (1993)), this rule applies only to the question of admissibility, but not also to the question of the reliability and the weight to be given to the confession at trial. Since the question here asks whether the death penalty was

used as a bargaining chip to obtain defendant's confession, it no longer impacts on the admissibility of that confession, which was already decided by the trial judge as a matter of law, but goes to the weight and credibility of the confession, which is a determination reserved solely for the trier of fact. See *People v. Jackson*, 303 Ill. App. 3d 583, 587, 715 N.E.2d 252, 255 (1999), citing *Crane v. Kentucky*, 476 U.S. 683, 689, 90 L. Ed. 2d 636, 644, 106 S. Ct. 2142, 2146 (1986) ("[T]he circumstances surrounding the taking of a confession are relevant both to the legal issue of voluntariness of the confession and to the factual question of the defendant's guilt or innocence. *** The jury had a right to weigh the credibility of defendant's confession along with the other evidence in the case"); *People v. Mullen*, 141 Ill. 2d 394, 403, 566 N.E.2d 222, 227 (1990) (the "jury is entitled to give little or no weight to a confession"); accord *People v. Seawright*, 228 Ill. App. 3d 939, 969, 593 N.E.2d 1003, 1023 (1992) ("A trial judge's determination that a statement is voluntary does not preclude the defendant from challenging the statement before the jury at trial; thus, the defendant has the right to present evidence to the jury which affects the credibility or weight to be given the confession"); see also *People v. Johnson*, 385 Ill. App. 3d 585, 598, 898 N.E.2d 658, 671 (2008) (holding that even when a trial judge rules that a confession is admissible it is error not to permit defendant to argue that the confession was unreliable and untruthful, or to present evidence to that effect); 725 ILCS 5/114—11(f) (West 2006) ("The issue of the admissibility of the confession shall not be submitted to the jury. The circumstances surrounding the making of the confession may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession").

## 2. Harmless Error

The State nevertheless contends that even if the trial judge's answer to the jury's inquiry was made in error, we should find the error harmless in light of the overwhelming evidence of defendant's guilt presented at trial. We disagree.

We first note that since this is a question of constitutional dimensions, in determining whether an error is harmless, the reviewing court considers whether the State has established beyond a reasonable doubt that the trial court's error did not contribute to the verdict obtained. *People v. Patterson*, 217 Ill. 2d 407, 428, 841 N.E.2d 889, 901 (2005); see also *People v. St. Pierre*, 122 Ill. 2d 95, 113-14, 522 N.E.2d 61, 68 (1988), citing *Chapman v. California*, 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827 (1967) ("[i]n order for an error to be held harmless, a reviewing court must be satisfied beyond a reason-

able doubt that the error did not contribute to the defendant's conviction"). To determine whether an error is harmless, " 'it is necessary to review the facts of the case and the evidence at trial' to determine the effect of the unlawfully admitted evidence 'upon the other evidence adduced at trial and upon the conduct of the defense.' " *St. Pierre*, 122 Ill. 2d at 114, 522 N.E.2d at 68-69, quoting *Fahy v. Connecticut*, 375 U.S. 85, 87, 11 L. Ed. 2d 171, 173-74, 84 S. Ct. 229, 230-31 (1963); see also *Patterson*, 217 Ill. 2d at 428, 841 N.E.2d at 902 (acknowledging three different approaches available to a reviewing court in determining whether an error is harmless: (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence).

Under the facts of this case, the State cannot establish beyond a reasonable doubt that the error committed by the trial judge here did not contribute to the defendant's conviction. The record below reveals that prior to the trial judge's response to the jury's question, the jurors deliberated for over six hours, and had to be sequestered overnight, after thrice indicating to the judge that they were "at an impasse." After receipt of the trial judge's response, however, the jury returned a guilty verdict in less than 20 minutes. "[A]lthough the length of subsequent deliberations, standing alone, is not conclusive in determining whether the court's remarks were the primary factor in the procurement thereof [citation], notably brief deliberations do invite such an inference ***." *People v. Branch*, 123 Ill. App. 3d 245, 252, 462 N.E.2d 868, 873 (1984), citing *People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601 (1972), *cert. denied*, 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731 (1973), and *People v. Richards*, 95 Ill. App. 2d 430, 237 N.E.2d 848 (1968); see also *People v. Ehlert*, 274 Ill. App. 3d 1026, 1035, 654 N.E.2d 705, 711 (1995), quoting *People v. Palmer*, 125 Ill. App. 3d 703, 712, 466 N.E.2d 640 (1984) (" '[t]he length of the jury deliberations and the jury's note demonstrate the closely balanced nature of the evidence' ").

In addition, contrary to the State's assertion, the record below reveals that apart from defendant's handwritten confession, the only evidence of defendant's participation in the crime came from two eyewitnesses, who initially failed to identify defendant as the shooter, and whose credibility in identifying defendant on the night in question was impeached at trial.

Lastly, in that respect, we note that our courts have repeatedly held that "a confession is the most powerful piece of evidence the

State can offer, and its effect [on the trier of fact] is incalculable." *People v. R.C.*, 108 Ill. 2d 349, 356, 483 N.E.2d 1241, 1245 (1985); see also *People v. Clay*, 349 Ill. App. 3d 24, 30, 811 N.E.2d 276, 282 (2004) ("confessions frequently constitute the most persuasive evidence against a defendant"); *St. Pierre*, 122 Ill. 2d at 114, 522 N.E.2d at 69 ("Confessions carry 'extreme probative weight' "). Where, as here, the trial judge specifically told the jury that the death penalty had not been taken off the table to elicit defendant's confession, implying that even with the death penalty looming over his head, defendant willingly spoke to police and incriminated himself in the shooting of the victim, we cannot, by any means, conclude beyond a reasonable doubt that such apparent bolstering of defendant's confession had no impact upon the determination of jury. See *Argentine*, 814 F.2d at 790, quoting *Bolenbach v. United States*, 326 U.S. 607, 612, 90 L. Ed. 350, 354, 66 S. Ct. 402, 405 (1946) ("The error occurred at the most critical stage of the trial, in the midst of the jury's deliberations. As Justice Frankfurter wrote some four decades ago: 'Particularly in a criminal trial, the judge's last word is apt to be the decisive word' "); see also *Tyner*, 30 Ill. 2d at 104, 195 N.E.2d at 677 ("Rarely, if ever, is a judge called upon to comment on the evidence during trial *** and under no circumstances should [the judge] express an opinion as to its veracity, for this is the province of the jury, and any intimation of such nature, however slight, may carry great weight with the jury and could prove controlling").

Inasmuch as we find that the trial court's substantive response to the jurors' question during deliberations impermissibly trespassed upon the jury's fact-finding prerogative, we need not discuss defendant's remaining arguments on appeal, including his contention that the State made improper and prejudicial comments regarding his prior criminal background during opening and closing arguments. Moreover, although the State agrees that the mittimus should be corrected, we find no point in doing so here since this case is being remanded for a new trial and new sentencing if defendant is found guilty upon retrial.

For the aforementioned reasons, we reverse and remand for a new trial.

Reversed and remanded.

CAHILL and McBRIDE, JJ., concur.