2024 IL App (1st) 221570-U

THIRD DIVISION
July 17, 2024

No. 1-22-1570

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | |
| v. | ) | No. 19 CR 13101 |
| | ) | |
| MARIO BASURTO, | ) | |
| | ) | Honorable Samuel Betar, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held:* Trial counsel did not render ineffective assistance for failure to (1) perfect the impeachment of the victim with his prior inconsistent statements to police and (2) request a jury instruction on the age of consent. We vacate defendant's conviction for intimidation under the one act, one crime rule. Affirmed as modified.

¶ 2    Following a jury trial, defendant Mario Basurto was found guilty of aggravated criminal sexual assault and intimidation, and the trial court sentenced him to concurrent terms of eight years' and three years' imprisonment, respectively. On appeal, defendant contends that he received ineffective assistance of trial counsel because counsel failed to (1) perfect the

impeachment of the victim with the victim's prior inconsistent statements to the police and (2) request a jury instruction on the age of consent. In the alternative, defendant asks that we vacate his conviction for intimidation under the one act, one crime rule. We affirm as modified.

¶ 3                                    BACKGROUND

¶ 4     Defendant was charged with one count of aggravated criminal sexual assault and one count of intimidation in connection with an incident occurring at a Macy's department store in Woodfield Mall on August 5, 2018. Count 1 of the indictment, which charged defendant with aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(4) (West 2020)), alleged that defendant knowingly committed an act of sexual penetration upon the victim (D.F.), *i.e.*, "contact between [defendant]'s mouth and D.F.'s sex organ," "during the course of the commission of any other felony, to wit: intimidation, by [defendant]." Count 2 alleged that defendant committed the offense of intimidation (720 ILCS 5/12-6(a)(5) (West 2020)); namely, that defendant intentionally and without lawful authority communicated to D.F. "by Snapchat, a threat to *** expose D.F. to hatred, contempt, or ridicule," which caused D.F. to "receiv[e] oral sex." In his pretrial discovery response, defendant indicated, *inter alia*, that he would rely upon the defense of consent.

¶ 5                                  Testimony of D.F.

¶ 6     The following evidence was adduced at trial. D.F. testified that, in August 2018, he was 17 years old and living with his parents. At that time, he said that he used both "Facebook" and "Snapchat" social media applications. At that time, he received a "friend" request from an individual named "Vanessa" on Facebook. D.F. looked at Vanessa's various profile pictures (agreeing that she appeared to be a female) and believed that she looked familiar, so he accepted her friend request. D.F. stated that he and Vanessa began communicating privately via Facebook "Messenger." D.F. added that he and Vanessa also communicated via Snapchat. D.F. agreed that,

with Snapchat, you can send a picture or text message, and then the application automatically deletes it after the recipient views it. D.F. confirmed that neither he nor Vanessa changed the application settings so as not to automatically delete text messages after viewing.

¶ 7    D.F. said that, at some point after they began communicating, Vanessa asked D.F. to send him a naked picture of himself. D.F. thought she was joking, did not take the request seriously, and initially refused to do so. Vanessa, however, continued "pressuring or pushing" D.F., so he sent her an upper body picture that he characterized as a "[p]rogress working out picture." Vanessa, however, "continued being pushy about the naked picture," so he sent her a random image of a naked individual that he found on Google. Vanessa did not believe that the photo was D.F., and she "continued being pushy" and told him to "quit stalling." D.F. eventually sent Vanessa a "snap," *i.e.*, a five-second video showing his "face, body[,] and private parts." D.F. then recounted that, after sending the video, "I got a notification saying [I] got screen-shotted [*sic*]," which he explained meant that Vanessa had saved the video rather than letting it be automatically deleted. D.F. said he "freaked out" and sent multiple messages to Vanessa asking her to delete it. According to D.F., Vanessa refused and told him that the "fun just started."

¶ 8    Vanessa told D.F., "Let's see what you're willing to do to get me to delete it." Although Vanessa "brought up the option about money," D.F. said he did not have any money at that time, so Vanessa's other option was for him to "perform sexual favors." Specifically, Vanessa demanded that she take D.F.'s "V card" (*i.e.*, his virginity), which he said meant penis-to-vagina sex. The other option Vanessa offered D.F. was for her "friend" to perform oral sex on him. D.F. said he was terrified and refused. D.F. asked Vanessa if there was another "option." She responded, "[B]ecause money is not an option, *** that's the only way." She further threatened to send the video to D.F.'s employer, family, and friends, and to also post it on various social

media platforms. D.F. said he kept trying to compromise with Vanessa, but she said that "it all had to be done today." Vanessa gave D.F. an address in Schaumburg, Illinois, to go to, and she said if he did not go to that location quickly, she would send the video to his employer, family, friends, "and all those things." While en route, however, D.F. was stopped for speeding and was issued a ticket. D.F. identified the speeding ticket in court, which was dated August 5, 2018.

¶ 9     D.F. said that during his traffic stop, Vanessa sent him Snapchat messages asking why he was taking so long and telling him to hurry up. D.F. told her that he was pulled over. D.F. admitted that, while he was sitting in a car next to a police officer, he did not tell the officer that he was being blackmailed. D.F. explained that he was scared and terrified, and he added that the officer asked him "multiple times *** if I was okay because I was shaking too much." After D.F. arrived at the address in Schaumburg, Vanessa's friend was not there. Vanessa told D.F. to go and "meet her friend" in the furniture department on the ground floor of the Macy's Department Store at Woodfield Mall in Schaumburg. D.F. went to that location and sat on a bench.

¶ 10     At that point, defendant (whom D.F. identified in court) walked up to him. D.F. said that he offered to buy defendant anything if he would tell Vanessa to delete the "picture [*sic*]" and that D.F. was "begging and pleading" defendant to "tell Vanessa *** whatever she wanted to hear just so the pictures get deleted." According to D.F., however, defendant told him that "it wasn't his deal; it was Vanessa's." D.F. said that defendant did not agree to D.F.'s offer to either buy something for or give money to defendant, but defendant did agree to "put a time limit on it." D.F. spent 20-30 minutes trying to convince defendant not to engage in the sex act with him, even while following defendant into the bathroom and into one of the handicapped stalls.

¶ 11    In the stall, D.F. said a timer was started.  D.F. did not agree to using a timer, but he said "it was the only way," explaining that, while the timer was running, defendant would perform oral sex on him.  He estimated that the timer was set for about one minute.

¶ 12    Defendant took D.F.'s pants down and put his mouth on D.F.'s penis.  D.F. said he never became erect and did not ejaculate at any point.  D.F. told defendant to stop "10 times," but defendant refused because defendant set the timer.  When the timer went off, defendant said, "[T]hat wasn't enough," but D.F. refused and told defendant to tell Vanessa to delete the pictures. Defendant then left the bathroom, and D.F. followed soon after while trying to reach Vanessa. D.F. could not reach Vanessa, so he contacted defendant to get Vanessa's phone number.[1]

¶ 13    D.F. then drove to an "Ulta" store in Schaumburg because Vanessa had told him that she worked there.  When he arrived, however, the store was closed and Vanessa did not answer his calls.  D.F. then went home and contacted Vanessa through Facebook Messenger.  D.F. wrote to Vanessa, "Promise me everything is done."  Vanessa replied that it was and that she was "[s]orry for everything."  D.F. responded, "You threatened me with everything and really hurt me.  You threatened me with money.  My dignity.  Basically did anything because of you."  Vanessa responded that D.F. had said "money was not an option," but she again said that she was sorry. D.F. told the court that Vanessa made him feel horrible, and he did not know that she was not real.

¶ 14    D.F. then went to his room and "laid down in sorrow" before going to the Elgin Police Department on that same day (August 5, 2018).  According to D.F., however, the police station was "closed" when he arrived.  He then returned the following day, spoke to a Detective Ziegler, and then went to Sherman Hospital where a sexual assault "kit" was performed.  The investigation

---

[1] On cross-examination, D.F. specified that he approached defendant outside of the bathroom to get Vanessa's phone number.  See ¶ 17, *infra*.

was subsequently transferred to the Schaumburg police department, where he spoke to a Detective Casey and later identified defendant from a photo array as the person who sexually assaulted him.

¶ 15    On cross-examination, D.F. admitted that he found Vanessa attractive.  D.F. further conceded that, although he stated that he did not find Vanessa sexually attractive, he nonetheless agreed to send her photos of his bare chest.  D.F. confirmed that no one forced him to take that photo and that he voluntarily sent it.  D.F. also conceded that, although he said he did not find Vanessa sexually attractive, he nevertheless sent her a picture of another person's genitals (from a Google internet search without first obtaining that individual's permission) and then sent Vanessa a five-second video of his penis.  D.F. further agreed that Vanessa did not threaten him with anything to induce him to send the video.

¶ 16    D.F. further admitted that, at that time, he had never had sexual relations with a woman and "that was part of a deal."  D.F. stated that, although he had his mobile phone with him while driving to meet Vanessa on Knollwood Drive, he never called his parents or the police, and he never asked for help from the police officer who had stopped him for speeding.  D.F. said he still did not call his parents or the police when he was redirected to go to Macy's.  D.F. agreed that, although he testified that he was terrified at the time, a terrified person would have asked for help.  D.F. stated that he tried to call his brother, but his brother did not answer.  D.F. acknowledged that he never told the police of his attempt to call his brother when they interviewed him.  D.F. further admitted that, at Macy's, defendant never threatened to physically hurt him, nor did defendant physically force D.F. into the men's bathroom.  D.F. confirmed that he could have left the bathroom at any time.  D.F. said that he never told the police that he pulled down either his pants or underwear.  D.F. did not recall whose phone was used as a timer or whether the timer was ever reset.

6

¶ 17    D.F. confirmed that defendant never physically injured him nor physically restrained D.F. from leaving the bathroom.  When asked whether D.F. ever told store personnel what had happened in the bathroom, D.F. stated, "It's an embarrassing topic, and *** I find it [a] very distraughtful [*sic*] thing in the end.  It's been a long, long time[,] and especially a lot [of] convincing myself to even stand here."  D.F. added that he hadn't told his family, either.  D.F. added that, after he left the bathroom, he approached defendant to ask for Vanessa's number.  D.F. explained that he was worried that Vanessa was "just going to go disappear and I'm not even going to make sure these photos get deleted."

¶ 18    D.F. agreed that defendant did not prevent him from leaving the store, and when he left, he did not call the police or his parents.  Instead, he went to the Ulta Beauty store because Vanessa had not answered his calls and he wanted to ensure the pictures were deleted.  D.F. waited in the parking lot until his phone's battery ran out, and then he went home.  D.F. said that he was not angry but was crying while driving home.  After he returned home, he went to his room and was still crying when his father came in and asked D.F. what was wrong.  D.F. said he did not want to say anything, and his father suggested that D.F. could "go talk to the police department or something."  D.F. noted that it was his father who convinced him to go to the police department.  When asked whether D.F. still wanted to have sex with Vanessa after the incident in the bathroom, D.F. replied, "I didn't.  It was part of the agreement—the V card agreement."

¶ 19                    Testimony of Detective Paula Casey

¶ 20    Schaumburg police detective Paula Casey then testified that she was assigned to interview D.F. regarding a reported sexual assault.  Detective Casey stated that she learned following her interview of D.F. that he had been threatened on Facebook and Snapchat.  Detective Casey stated that the Facebook account was under the name of "Vanessa Reyes," and the name on the Snapchat

7

account was listed as "thatmexicanwondertaco_69." Her investigation eventually revealed that the same e-mail address was used to set up both the Facebook and Snapchat accounts, and the names associated with the e-mail address were Mario Basurto and Marco Basurto. Detective Casey eventually located defendant's address.

¶ 21 On July 23, 2019, Detective Casey and her partner, Detective Goodwin, spoke to defendant (whom she identified in court) outside of his residence. Defendant admitted that he had portrayed himself online as Vanessa Reyes (whom defendant said did not exist) and that he friend requested D.F. Defendant admitted that D.F. had sent him a video in which D.F. was not wearing any clothing. Defendant further admitted telling D.F. that D.F. had to have "a bisexual friend of [Vanessa] perform oral sex on D.F. or else [defendant] was going to show the video" on social media and to D.F.'s employer. D.F. offered to pay defendant money or buy something for defendant, but defendant refused, so D.F. and defendant met at Macy's in Woodfield Mall, where they went into the men's bathroom and defendant placed his mouth on D.F.'s penis. Defendant told Casey that D.F.'s penis never became erect, and while this was occurring, D.F. was looking away and asking defendant to stop, but defendant did not stop. Defendant further informed Casey that he had obtained a new phone and no longer had the same phone as at the time of the incident.

¶ 22 Detective Casey then testified that defendant voluntarily came to the police department on July 29, 2019. After reading defendant his *Miranda* rights, she interviewed defendant, which was video recorded. The State played defendant's video recorded interview for the jury.

¶ 23 In the video, defendant stated the following. In the summer of 2018, defendant sent D.F. a friend request on Facebook after seeing him on social media. Defendant did not know D.F. or have mutual friends with him before this time. Defendant created a Facebook profile with the name "Vanessa Reyes" accompanied with a photograph of an unknown female defendant found

8

online. Defendant (posing as Vanessa) admitted asking D.F. to send nude photos of D.F. Defendant remembered at some point telling D.F. to send a "real" nude photo to the Vanessa account. Defendant acknowledged that, at around 2 p.m. on August 5, 2018, D.F. sent a five- to eight-second recording of his penis to Vanessa, of which defendant then took a screenshot.

¶ 24 D.F. asked defendant/Vanessa to delete the screenshot, but Vanessa asked D.F. what he would do in exchange for deleting the screenshot and told D.F. that the "fun is just starting." Vanessa asked for money and sexual favors, but D.F. refused. At that point, Vanessa told D.F. that if D.F. would not provide money, then it had to be "something physical," which Vanessa explained would involve D.F. allowing her bisexual male friend to perform oral sex on D.F. Defendant (again, as Vanessa) then told D.F. that, if D.F. refused, the screenshot of D.F.'s penis would be "all over social media and [D.F.'s] place of employment." D.F. eventually agreed and went to the Macy's department store in Woodfield Mall to meet Vanessa's friend.

¶ 25 At Macy's, they went into a stall in the men's bathroom, and D.F. offered to buy defendant something at the mall or give defendant money. Defendant refused, however, and told D.F., "Vanessa asked me to do this." Defendant sensed that D.F. still believed Vanessa was an actual person. D.F. started to pull down his pants, but defendant could not recall whether he then helped D.F. pull them down. While D.F.'s back was facing the wall, defendant placed his mouth on D.F.'s penis. D.F. asked defendant to stop after about 10-15 seconds had elapsed, but defendant said he "kept going." D.F. asked defendant again to stop after about another 15 seconds had elapsed. Defendant said that people started to come into the bathroom at that time, so they "called it quits." Defendant thought the entire incident was "not even" five minutes. Defendant said D.F.'s penis was "kind of" erect "but not really" and that D.F. did not ejaculate.

¶ 26 Defendant then left the stall and bathroom. D.F. followed shortly afterward, asking defendant to tell Vanessa "it was done." D.F. asked defendant for Vanessa's phone number, defendant gave D.F. a random number and said Vanessa worked at Ulta. D.F. later sent a message to "Vanessa" on Snapchat stating that he was outside of the Ulta store but the store was closed. Defendant responded (as Vanessa) that she left through the back of the store and went home. D.F. asked Vanessa to delete the photos and said that they were "going [their] separate ways."

¶ 27 In the video, defendant stated that he realized how "messed up" the situation was and said no one should have to go through it. Defendant added that, if he were in D.F.'s position, defendant would not like it and would have felt "violated." Defendant consented to a search of his phone but he stated that he had obtained a new phone and phone number since the incident and that everything of a sexual nature was on his old phone. Defendant explained that his parents took away his old phone because they were not "okay" with his sexuality and knew that defendant had been "hanging out" with another guy. Defendant further confirmed that nothing had been saved to his Facebook or Snapchat accounts.

¶ 28 After the video was played for the jury, the State continued its direct examination of Detective Casey. She stated that, during the interview, she had been reading from the police report from the Elgin police department. She further confirmed that the Elgin police department prepared the report in response to this incident.

¶ 29 On cross-examination, Detective Casey stated that D.F. accepted Vanessa's Facebook friend request because he believed they had friends in common. The trial court then sustained the State's hearsay objection when defense counsel asked whether the report from the Elgin police department indicated "why [D.F.] had chosen to drive to [Ulta]." The trial court also sustained the State's hearsay objections to the following questions by trial counsel: whether D.F. described

what happened when he drove to Ulta, whether D.F. was looking for anyone when he arrived at Ulta, whether D.F. stated how many times he told defendant to stop, and whether "it [was] ever disclosed" that D.F.'s parent's credit cards were used. Detective Casey stated that nothing in her investigation revealed any use of D.F.'s parent's credit cards.

¶ 30                                    Testimony of Rachel McDonnell

¶ 31    Rachel McDonnell testified that she was working as a sexual assault nurse examiner at Sherman Hospital in Elgin, Illinois, in August 2018. McDonnell stated that she examined D.F. at around 3:30 p.m. on August 6, 2018. The examination lasted about two hours. McDonnell was allowed to read from her notes and recounted the following:

> "A female was blackmailing me with pictures of me. She asked me, 'What would you do for me to delete these photos?' She wanted money from me[,] but I [didn't] have money. She said she wanted something physical. She wanted me to have intercourse with her and a dude. I said no. She threatened to post the pictures to my job and everywhere.

> She wanted to see how far I would go and said her male bisexual friend wanted 'that.' 'Come to Macy's now.' She kept blackmailing me. She said she wanted to watch it but then she didn't. I tried talking to the dude trying not to force me to do this but he said, and I quote, 'I didn't make the deal and I'll tell her. Let's talk in the bathroom.'

> I tried to talk him out of it. I kept telling him no, but he forced me into a stall. He forced me to take[ ]off my pants. 'You

11

> better do this,' as he took my clothes down. I eventually pushed him
> off because he wouldn't leave me alone. Then we left and I did not
> ejaculate."

As to D.F.'s demeanor during the examination, McDonnell stated that D.F. would not look at her, kept his head down during the entire examination, and looked very upset and embarrassed. McDonnell's impression was that D.F.'s recounting of the incident "was not pleasurable for him."

¶ 32                                    The Conclusion of Trial

¶ 33    The parties next stipulated, *inter alia*, that defendant's DNA profile was found in a saliva sample on D.F.'s underwear. The State then rested, defendant waived his right to testify, and the defense elected not to present evidence. The cause proceeded to closing arguments.

¶ 34    During his closing argument, defense counsel argued in substance that the evidence indicated that D.F. consented to a "two-part deal" in which the first part—the incident in the men's bathroom—would then lead to the second part—sex with Vanessa. Counsel challenged the State's argument that D.F. was "a child" by noting that D.F. was in college in a "pre-med program." Counsel further commented on the various inconsistencies in D.F.'s testimony.

¶ 35    During jury instructions, the trial court instructed the jury, *inter alia*, that "[t]he word consent means a freely given agreement to the act of sexual penetration in question. Lack of verbal or physical resistance or submission by the complainant resulting from the use of force or threat of force by the defendant shall not constitute consent." The trial court also instructed the jury that neither opening statements nor closing arguments were evidence, and that any statements or arguments not based on the evidence should be disregarded.

¶ 36    While the jury was deliberating, it sent out four questions, including one asking what "the age of consent" was in Illinois. The trial court proposed the following response: "You have all

the evidence and the instructions on the law.  Please continue to deliberate."  The State and trial counsel agreed with the trial court's proposed response, which was then sent to the jury.

¶ 37    The jury found defendant guilty of both aggravated criminal sexual assault and intimidation.  The trial court later held a sentencing hearing, after which the court sentenced defendant to concurrent terms of eight years' and three years' imprisonment for the aggravated criminal sexual assault and intimidation convictions, respectively.  This appeal follows.

¶ 38                                    ANALYSIS

¶ 39    Defendant first contends that his trial counsel rendered ineffective assistance for failure to (1) perfect the impeachment of D.F. with his prior inconsistent statements to police and (2) request a jury instruction on the age of consent.  In particular, defendant argues that trial counsel failed to either question D.F., call the relevant witness, or correctly defend against the State's objection.  In addition, defendant argues that trial counsel was ineffective because he failed to seek a jury instruction as to the age of consent when the jury sent back that question during its deliberations.  In the alternative, defendant contends that, should we reject his claims of ineffective assistance of counsel, we should vacate his conviction for intimidation pursuant to the one act, one crime rule.

¶ 40                      I.  Ineffective Assistance of Counsel

¶ 41    The right to the effective assistance of counsel at trial is derived from the sixth amendment of the United States Constitution (U.S. Const., amend. VI), applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV).  *People v. Ballard*, 206 Ill. 2d 151, 171 (2002).  Claims of ineffective assistance of counsel are governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which our supreme court adopted in *People v. Albanese*, 104 Ill. 2d 504 (1984).  *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010).  To establish ineffective assistance, a defendant must show both that (1) counsel's performance was deficient

13

and (2) the deficient performance prejudiced the defendant. *Id.* (citing *Strickland*, 466 U.S. at 687). Deficient performance is performance that is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 496-97; *Strickland*, 466 U.S. at 690, 694.

¶ 42 Failure to show either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 130 (citing *Strickland*, 466 U.S. at 687). Whether defendant received ineffective assistance of counsel is a mixed question of fact and law. *Id.* (citing *Strickland*, 466 U.S. at 698). Therefore, although we must defer to the trial court's factual findings, we review *de novo* the ultimate legal issue of whether counsel's omission supports an ineffective assistance claim. *Id.*; *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). We now turn to defendant's two claims of ineffective assistance of counsel.

¶ 43                                    *A. Impeachment of D.F.*

¶ 44 Defendant first argues that trial counsel was ineffective because he failed to perfect the impeachment of D.F. Specifically, defendant argues that trial counsel failed to "lay the groundwork for that impeachment" by either (1) interrogating D.F. on those inconsistencies, (2) calling Zeigler as a witness (because he purportedly elicited those inconsistent statements from D.F.) or (3) "properly respond when off-point hearsay objections were made."

¶ 45 Defendant further points to numerous instances that defendant argues are inconsistencies in D.F.'s testimony that "collectively undermin[ed]" the accuracy of D.F.'s testimony. The entire list consists of the following 12 points:

> (1) At trial, D.F. testified that he told police that *defendant*
>
> pulled down D.F.'s pants and underwear; whereas the police report

indicated that *D.F. began* pulling his pants down when defendant began assisting D.F. with his pants;

(2) At trial, D.F. testified that, when D.F. asked Vanessa to delete the screenshot of his genitals that he had sent to her, Vanessa's *initial* response was that the fun was just beginning before soliciting money from him; whereas the police report indicated that Vanessa initially asked what D.F. would do in exchange for her deleting the file, and after D.F. asked again, Vanessa's *second* response was to refuse, tell him that "the fun had just started," and again ask what D.F. was willing to do.

(3) At trial, the State asked D.F. whether Vanessa asked for money or sexual favors in *two* separate questions; whereas the police report indicated that Vanessa asked D.F. for money and sexual favors in purportedly *one* statement.

(4) At trial, D.F. testified that Vanessa's initial response to him asking her to delete the screenshot was "basically her taking my V card," *i.e.*, D.F.'s virginity (implying sex with her), and *then* asking that he allow her bisexual friend to give him oral sex; whereas the police report indicated that Vanessa told D.F. he would have to do "something physical" and explained it *only* would be for D.F. to allow Vanessa's bisexual friend to give him oral sex.

(5) At trial, D.F. testified that he did not learn that Vanessa would not be at the Knollwood address until *after* he had been

stopped; whereas in the police report, D.F. stated that, when Vanessa told him to go to the address on Knollwood Drive, he knew *before* he was stopped for speeding while en route that Vanessa would not be there.

(6) At trial, D.F. testified that, after going to the designated area, he sat on a bench, and defendant walked up to him; whereas the police report stated that, at Macy's, D.F. went to the area he was directed to and approached a white male.

(7) At trial, D.F. testified that he was trying to convince defendant to tell Vanessa "whatever she wanted to hear just so the pictures get deleted" for *about 20-30 minutes before* going to the bathroom with defendant; whereas the police report stated that D.F. tried to "negotiate a way out" with defendant *after* they went into the bathroom.

(8) At trial, D.F. initially stated that the timer was set for "probably like a minute" before estimating a time of 10 minutes; whereas the police report stated that defendant agreed to place a *five-minute* timer on the sex act.

(9) At trial, D.F. stated that the toilet was *to his left*, while his back was against a wall; whereas the police report stated that D.F. was positioned with the toilet *behind* him.

(10) At trial, D.F. testified on direct that defendant wanted "more" when the timer expired, but D.F. refused, and the two left

the bathroom; whereas the police report stated that D.F. told defendant to stop multiple times before pushing defendant away. [2]

(11) At trial, D.F. stated that he and defendant left the bathroom together immediately after the incident; whereas the police report stated that defendant left and told D.F. he would have Vanessa delete the image, and D.F. stayed in the stall a few minutes before leaving.

(12) At trial, D.F. testified that, after leaving Macy's, he went to Ulta because Vanessa was not answering his calls and because he thought that she may still be working there; whereas the police report stated that D.F. was able to contact Vanessa via Snapchat, who told him to meet her at the Ulta Beauty parking lot.

Defendant further notes that there were various contradictions and missing facts when comparing D.F.'s trial testimony and McDonell's report at the time D.F. was examined at the hospital. Defendant states that trial counsel also failed to elicit an explanation for these matters, as well.

¶ 46    Defendant's claim centers on trial counsel's failure to impeach the credibility of the complaining witness, D.F.  Although it is true that the failure to properly cross-examine a witness can result in a successful claim of ineffective assistance of counsel (see, *e.g.*, *People v. Williams*, 329 Ill. App. 3d 846 (2002); *People v. Skinner*, 220 Ill. App. 3d 479 (1991)), Illinois courts have

---

[2]  We note that the record reveals that, on cross-examination, D.F. said he "believed" he asked defendant to stop "10 times," and then explained that, "even after 10 minutes finished," defendant "kept going," at which point D.F. pushed defendant away because "[defendant] wasn't listening to me."  The State did not ask D.F. any detailed questions about the incident in the bathroom, including whether he had to push defendant away from him.

long held that a complainant's testimony need not be "unimpeached, uncontradicted, crystal clear, or perfect" in order to sustain a conviction (*People v. Soler*, 228 Ill. App. 3d 183, 200 (1992)). In addition, where, as here, "minor inconsistencies or discrepancies exist in a complainant's testimony but do not detract from the reasonableness of [his] story as a whole, the complainant's testimony may be found to be adequate to support a conviction ***." *Id.* This is especially true where the witness's testimony relates to a traumatic event. See *People v. Brooks*, 187 Ill. 2d 91, 133 (1999). Finally, discrepancies in testimony "do not necessarily *destroy* the credibility of a witness"; they merely go to the *weight* to be afforded the testimony. (Emphasis added.) *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 85 (quoting *People v. Ranola*, 153 Ill. App. 3d 92, 98 (1987)).

¶ 47    In this case, the claimed inconsistencies all related to collateral matters that did not otherwise detract from D.F.'s story as a whole, namely, that defendant obtained a compromising video of D.F. and blackmailed him into engaging in oral sex in exchange for defendant deleting the video and not disseminating it to D.F.'s family and employer. Furthermore, D.F. suffered a traumatic event, so minor inconsistencies in his testimony related to that event are to be expected. See *Brooks*, 187 Ill. 2d at 133. Based upon our review of the record, trial counsel's failure to impeach D.F. on these minor points of discrepancy was not objectively unreasonable (see *People v. Williams*, 147 Ill. 2d 173, 238-39 (1991) ("defense counsel is not required to undertake fruitless efforts to demonstrate his effectiveness")), and given the facts of this case, there is no reasonable probability that the verdict would have been different had counsel impeached D.F. on these matters. Defendant's ineffective assistance of counsel claim thus fails both prongs of *Strickland*.

¶ 48    Nonetheless, defendant maintains that trial counsel was constitutionally ineffective for failing to properly cross-examine D.F. In support of his claim, he relies upon *Williams* and *Skinner* in support of his claim, but his reliance upon those cases is misplaced. In *Williams*, this court

found that, although the evidence in the case was "close," trial counsel failed to resolve what the two victims (and sole witnesses) stated to officers on the scene, never called the officers to testify, and entered into a stipulation that "lack[ed] clarity" and referred to police reports that were never made a part of the common law record. *Williams*, 329 Ill. App. 3d at 855-57. We thus held that trial counsel's errors in cross-examining witnesses and entering into an ambiguous stipulation raised a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Id.* at 857. Here, however, unlike in *Williams*, the evidence was not close, and trial counsel's alleged errors related to impeaching D.F. on minor inconsistencies in his testimony that did not otherwise detract from the reasonableness of his story as a whole. Therefore, even if trial counsel had thoroughly cross-examined D.F. on every asserted point of inconsistency, the result of defendant's proceedings would not have been different based upon both the substance of D.F.'s testimony and defendant's video recorded statements.

¶ 49    In *Skinner*, we held that trial counsel's failure to both (1) call the defendant's mother and stepfather to corroborate defendant's trial testimony that he did not live in a residence where stolen goods were found and (2) cross-examine a third witness regarding that witness's post-theft silence constituted ineffective assistance of counsel "which, when combined," met the second prong of the *Strickland* test. *Skinner*, 220 Ill. App. 3d at 484. In particular, we noted that counsel "only repeated portions of the direct examination and otherwise attempted no impeachment" during cross-examination of the identification witness. *Id.* Here, there is no similar combination of errors that would mandate relief, and D.F.'s testimony was corroborated: the jury heard not only D.F.'s

19

testimony but also defendant's video recorded statement to police describing what was unmistakably a nonconsensual sexual act. *Williams* and *Skinner* are therefore unavailing.[3]

¶ 50                                    *B. Jury Instructions*

¶ 51    Defendant further contends that trial counsel was ineffective for failure to request a jury instruction on the age of consent in response to the jury's question on that point. Defendant argues that counsel's failure to "insist" on the instruction was "another abject failure in the performance of his duties" that left open the "possibility" that the jury could have concluded that D.F. lacked the legal capacity to consent, irrespective of whether he actually did so. According to defendant, this resulted in prejudice under *Strickland*.

¶ 52    In essence, defendant challenges trial counsel's failure to object to the trial court's response to the jury question, which hinges on showing that the court's response was improper. *People v. Averett*, 237 Ill. 2d 1, 24 (2010). Generally, a court must provide an instruction to the jury when the jury has posed "an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion." *Id.* The court, however, may exercise its discretion and decline to provide answers to a jury's questions where: (1) the instructions are understandable and explain the law; (2) further instructions would serve no purpose or potentially mislead the jury; (3) the jury's question involved one of fact; or (4) if providing an answer would cause the court to express an opinion that would likely direct a verdict one way or the other. *People v. Kliner*, 185 Ill. 2d 81, 163 (1998). We review the trial court's decision as to how to respond to a jury question for an abuse of discretion. *People v. Davis,* 393 Ill. App. 3d 114, 126 (2009). An abuse of discretion

---

[3] Defendant also asserts that the State argued that D.F. was never impeached, but we note that the quoted portion of the report of proceedings where the State makes those arguments took place *after* trial and were *never* presented to the jury. Defendant's assertion on this point is therefore meritless.

occurs when the circuit court's decision is " 'arbitrary, fanciful or unreasonable,' " or where " 'no reasonable person would agree with the position adopted by the trial court.' " *People v. Simmons*, 2019 IL App (1st) 191253, ¶ 9 (quoting *People v. Becker*, 239 Ill. 2d 215, 234 (2010)).

¶ 53    In this case, the trial court did not abuse its discretion in refusing to respond to the jury's question as to the legal age of consent in Illinois.  At the outset, defendant argues that, in the absence of an instruction as to the legal age of consent, the jury "could easily believe" that D.F. could not give knowing consent at the age of seventeen.  Absent a showing to the contrary, however, this court must presume that the jury followed the court's instructions in reaching its verdict.  *Crawford*, 2013 IL App (1st) 100310, ¶ 139 (citing *People v. Simms*, 192 Ill. 2d 348, 373 (2000)).  Defendant points to nothing, nor do we find anything, to rebut that presumption.

¶ 54    In addition, the instructions tendered to the jury accurately stated the applicable law concerning both aggravated criminal sexual assault and intimidation.  As defendant recounts, this court has noted that there is no explicit statute defining the age of consent (see *People v. Carter*, 2022 IL App (1st) 210261, ¶ 80); rather, our supreme court inferred a "prescribed" age of consent as generally 17 but also 18 under certain circumstances (see *People v. Lloyd*, 2013 IL 113510, ¶ 30).  Responding to the jury's question as to the age of consent would substantially increase the risk of misleading the jury as to D.F.'s ability to consent.  In light of this risk, the trial court's decision not to provide an answer to the jury's question (other than to continue deliberating) was neither arbitrary, fanciful, unreasonable, nor one that no reasonable person would take.  See *Simmons*, 2019 IL App (1st) 191253, ¶ 9 (quoting *Becker*, 239 Ill. 2d at 234).  Accordingly, the court did not abuse its discretion, and defendant's ineffective assistance of counsel claim necessarily fails.  See *Davis,* 393 Ill. App. 3d at 126; *Averett*, 237 Ill. 2d at 24.  In any event, even assuming, *arguendo*, the trial counsel's failure to request a jury instruction as to the age of consent

was objectively unreasonable, defendant cannot establish the second prong of *Strickland*: As discussed, D.F.'s testimony and defendant's video recorded statement unmistakably establish nonconsensual sexual activity. Defendant's claim is thus unavailing on this additional ground.

¶ 55 Moreover, our decision is unaffected by defendant's citation to *People v. Lowry*, 354 Ill. App. 3d 760 (2004). In *Lowry*, this court held that the defendant's trial counsel was ineffective for failing to request the Illinois Pattern Jury Instruction (IPI instruction) on the definition of "knowingly"—an element of the crime in that case—despite the fact that the jury requested a definition and expressed confusion as to its meaning. *Id.* at 765. Here, by contrast, consent was not an element of the crime in this case. In any event, as noted above, even if trial counsel's failure to request a non-IPI instruction on the age of consent was objectively unreasonable, defendant cannot meet the second prong of *Strickland* because there is no reasonable likelihood the result of his trial would have been different. Defendant's reliance upon *Lowry* is therefore misplaced.

¶ 56                                    *C. Cumulative Effect*

¶ 57 The defendant also contends that, even if the claimed errors do not individually warrant a new trial, the cumulative effect of them does. Individual trial errors may have the cumulative effect of denying a defendant a fair trial. *People v. Hall*, 194 Ill. 2d 305, 350-51 (2000). Here, however, we have rejected defendant's claims of error. Accordingly, defendant's request for a new trial on the basis of cumulative error is without merit. See *id.*

¶ 58                            II. The One-Act, One-Crime Rule

¶ 59 Finally, defendant contends in the alternative that his conviction for intimidation should be vacated pursuant to the one-act, one-crime rule. Defendant argues that, since the offense of intimidation was an element of the aggravated criminal sexual assault charge, it was impossible for the State to obtain a conviction for aggravated criminal sexual assault without a conviction for

intimidation. Therefore, according to defendant, intimidation was a lesser-included offense of aggravated criminal sexual assault, warranting vacatur. The State agrees that the conviction for intimidation should be vacated. Although this issue is unpreserved, the parties correctly observe that we may nonetheless review this claim because one-act, one-crime violations constitute second-prong plain error. *People v. Coats*, 2018 IL 121926, ¶ 10.

¶ 60     Under well-established one-act, one-crime principles, a defendant cannot be convicted of multiple offenses "carved from the same physical act," where "act" is defined as "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977). This rule also prohibits multiple convictions where the offenses are based on separate acts, but one offense is a lesser-included offense of another. See *People v. Reveles-Cordova*, 2020 IL 124797, ¶ 12 (citing *People v. Miller*, 238 Ill. 2d 161, 165 (2010)).

¶ 61     Accordingly, we employ a two-step analysis. First, we must determine whether the defendant's conduct involved multiple acts or a single act. *Id.* As noted, multiple convictions based upon the same physical act are improper. *Id.* Second, where (as here), the conduct involved multiple acts, the court must determine whether one offense is a lesser-included offense of another. *Id.* If an offense is a lesser-included offense, multiple convictions are improper. *Id.*

¶ 62     We employ the abstract elements approach to determine whether one offense is a lesser-included offense of another. *Id.* ¶ 13. This approach asks whether one offense includes all of the statutory elements of another offense but does not contain any element not included in the other offense. *Id.* "In other words, it must be impossible to commit the greater offense without necessarily committing the lesser offense." *Id.* In making this determination, we look to the specific statutory subsections under which the defendant was charged and convicted. *Id.* ¶¶ 14-20. When multiple convictions are obtained for the predicate offense as well as the greater offense,

we must vacate the conviction on the lesser-included offense. *Id.* ¶ 21; see also *People v. Lee*, 213 Ill. 2d 218, 227 (2004). We review one-act, one-crime challenges *de novo. People v. Artis*, 232 Ill. 2d 156, 161 (2009).

¶ 63    In this case, we agree with the parties. The State charged defendant with intimidation for having unlawfully threatened D.F. via Snapchat to expose D.F. to hatred, contempt or ridicule that caused D.F. to receive oral sex. The State also charged defendant with aggravated criminal sexual assault for having committed an act of sexual penetration upon D.F. (*i.e.*, contact between defendant's mouth and D.F.'s penis) during the commission of another felony: intimidation. Therefore, since it was impossible to obtain a conviction for aggravated criminal sexual assault without a conviction for intimidation, defendant's conviction for intimidation cannot stand because it is a lesser-included offense of the charged offense of aggravated criminal sexual assault. *Reveles-Cordova*, 2020 IL 124797, ¶ 21; see also 720 ILCS 5/11-1.30(a)(4), (d) (West 2020) (aggravated criminal sexual assault under subsection (a)(4) is a Class X felony); 720 ILCS 5/12-6(a)(5), (b) (West 2020) (intimidation is a Class 3 felony). Therefore, pursuant to Supreme Court Rule 615(b)(1) (Ill. S. Ct. R. 615(b)(1) (eff. Jan.1, 1967)), we direct the circuit clerk to vacate defendant's conviction for intimidation. See *People v. McCray*, 273 Ill. App. 3d 396, 403 (1995) (holding that this court may directly order the clerk to correct the mittimus).

¶ 64                                    CONCLUSION

¶ 65    Trial counsel did not provide ineffective assistance for a purported failure to either perfect the impeachment of the victim with his prior inconsistent statements to police or request a jury instruction on the age of consent. We vacate defendant's conviction for intimidation under the one-act, one-crime rule.

¶ 66    Affirmed as modified.